PATRICIA E. MYSSE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2611-69, 4329-69, 6057-71. Filed February 28, 1972.

---

[1] Consolidated herewith are the proceedings of Arne R. Mysse, Transferee, docket No. 4329-69 ; and Patricia E. Mysse, Transferee, docket No. 6057-71.

*John C. Sheehy*, for the petitioners.
*Eugene P. Bogner* and *S. Clay Freed*, for the respondent.

FEATHERSTON, *Judge:* These three consolidated proceedings involve disputed income tax deficiencies and transferee liabilities. In a notice of deficiency addressed to Arne O. Mysse (deceased) and Patricia E. Mysse (docket No. 2611-69), respondent determined the following deficiencies in income tax:

| Year | Amount |
| --- | --- |
| 1963 | $12, 192. 75 |
| 1964 | 6, 002. 93 |
| 1965 | 29, 772. 16 |
| 1966 | 29, 709. 77 |

Jeopardy assessments were made of these amounts, together with interest, on April 4, 1969. Patricia E. Mysse (hereinafter referred to as Patricia) seeks a redetermination of the deficiencies as to her, but no petition has been filed on behalf of Arne O. Mysse, deceased (hereinafter Mysse), or his estate.

In a notice of liability addressed to Arne R. Mysse, transferee (docket No. 4329-69), respondent determined that Arne R. Mysse (hereinafter Arne), son of Mysse and Patricia, is liable as transferee for $20,000 of the income tax liabilities of Mysse. The liabilities referred to in this notice include the foregoing amounts for 1963 through 1966 and, in addition, $30,733.02 and a delinquency penalty under section 6651 [2] in the amount of $7,550.28 for 1967.

After subsection (e) was added to section 6013 for the relief of innocent spouses filing joint returns, a notice of liability was addressed to Patricia (docket No. 6057-71) in which respondent determined that she is liable as transferee for $10,000 of Mysse's income tax liabilities for 1963 through 1967, described above. Patricia filed a new proceeding, and in his answer in this docket, respondent alleged that Patricia is liable, as transferee, for an additional amount of $25,900.77, bringing respondent's total transferee claim against her to $35,900.77 plus interest as provided by law.

The issues presented for decision are as follows:

(1) Whether Mysse realized income during 1963 through 1966 from the misappropriation of funds from the First National Bank, Hysham, Mont., which was not reported in the joint returns filed for those years by him and Patricia; and what was the amount of his income tax liability for 1967, a year for which he filed no return;

---

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted.

(2) If Mysse understated his income in the joint returns filed for 1963 through 1966, whether Patricia is relieved of liability for the resulting deficiencies in income tax by section 6013(e) ; and

(3) Whether Patricia and Arne are liable as transferees for any part of the unpaid income tax liabilities of Mysse.

FINDINGS OF FACT

*General*

Patricia was a legal resident of Forsyth, Mont., at the time she filed her petitions. Arne was a legal resident of Billings, Mont., at the time he filed his petition. Patricia and Mysse filed joint Federal income tax returns for 1963 through 1966 with the district director of internal revenue, Helena, Mont. Patricia is now married to Jack Allread, and they reside in Forsyth, Mont.

*Issue 1. Unreported Income*

Mysse started to work as the cashier for the First National Bank in Hysham, Mont. (hereinafter sometimes referred to as the First National Bank or the bank), in 1951. From that time until he was discharged on October 10, 1967, he was the principal managing officer of the bank. In this capacity, he performed all usual banking functions. He was assisted in these activities by three or four tellers and clerks. However, Mysse alone granted all but a few, insubstantial loans, entered into participation agreements with other banks, and posted interest to savings accounts and certificates of deposit. In addition, he operated an insurance business on the bank premises under the name of Mysse Agency. He also occasionally served as the clerk of local auction sales and, from time to time, served as the executor or administrator of decedents' estates. He received income from all of these sources.

For some time prior to his death in October 1967, Mysse was subject to epileptiform seizures caused by the growth of a brain tumor. In February 1967, he underwent brain surgery, and the tumor was partially removed. His condition was diagnosed as terminal. In July 1967, Mysse was involved in an accident which completely demolished the automobile he was driving. He sustained serious facial fractures and broken jaws. On October 26, 1967, he entered a hospital for an operation on his jaws and remained there through October 28. He was discharged from the hospital on the morning of October 29, and at 12:30 p.m. of that day he suffered a bullet wound in his right temple from which he died that night.

After Mysse's employment at the bank had terminated, Charles W. Thompson (hereinafter Thompson) on October 26, 1967, applied to the bank for a loan, offering four savings certificates of deposit, apparently issued by the First National Bank, in the total face amount of $40,000 as security. Barry M. Edward (hereinafter Edward), who

had succeeded Mysse as cashier, granted the loan and requested Bertha Wright (hereinafter Wright) to record on the bank's copies of the certificates a notation that they had been pledged as collateral. Under the administrative procedures followed by the bank, when a certificate of deposit was sold two copies of the certificate were retained in the bank's files and the sale was recorded in the bank's daily blotter, i.e., the daily record of all banking transactions.

Wright did not recognize the forms of the Thompson certificates of deposit, and a search of the bank records by her and Edward failed to disclose any copies of them. Edward thereupon sent Wright to question Mysse, whose signature appeared on the certificates, as to where the copies could be found.

When Wright talked with Mysse about the certificates on October 26, 1967, he seemed to be incoherent and failed to offer a satisfactory explanation as to the location of the copies. After banking hours on the same day, Edward contacted John Grierson (hereinafter Grierson), president and one of the directors of the bank, and the two of them again looked through the bank records for copies of the certificates. When this investigation also failed to produce the bank copies of the certificates, Grierson called Robert R. Mountain (hereinafter Mountain), a certified public accountant and the bank's auditor, and asked him to assist.

Mountain came to the bank after business hours on October 27, 1967, and made another search of the bank records. When this examination also failed to produce copies of the certificates, Mountain examined the bank's daily blotters and found that they did not reflect the issuance of the Thompson certificates. On October 27 or 28, 1967, calls were made to the regional administrator of national banks, the Federal Bureau of Investigation (hereinafter FBI), and the bank's bonding company. On Saturday, October 28, 1967, bank examiners and FBI agents appeared at the bank and commenced an investigation. Mountain was retained by the bank to determine the extent of its loss and to prepare a proof-of-loss statement for presentation to the bank's bonding company.

After his father's death, Arne found among the Mysse Agency files, which had been removed from the bank during October, copies of 36 certificates of deposit and written notations relating to the issuance of two other certificates, numbered 415 and 422. The certificates were all of the same type, and all of them bore Mysse's signature. Among these papers were the missing copies of Thompson's four certificates. On November 5, 1967, Arne turned these copies and notations over to one of the FBI agents at the bank.

Subsequent investigations showed that the following certificates, all paid for by individuals or corporations in money or money's worth, were not reflected on the records of the bank:

## TABLE I

| Certificate of deposit | | | Certificate of deposit | | |
|---|---|---|---|---|---|
| Date | No. | Amount | Date | No. | Amount |
| *1963* | | | *1966* | | |
| Jan. 16 | 112 | $2,977.75 | Jan. 11 | 253 | $1,000.00 |
| Oct. 22 | 124 | 4,000.00 | Feb. 18 | 261 | 1,800.00 |
| | | | May 16 | 263 | 3,584.00 |
| *1964* | | | June 1 | 411 | 10,000.00 |
| Dec. 23 | 171 | 10,000.00 | July 3 | 413 | 3,000.00 |
| Dec. 31 | 172 | 2,000.00 | July 22 | 412 | 5,000.00 |
| | | | Sept. 28 | 414 | 3,000.00 |
| *1965* | | | Nov. 30 | 415 | 1,000.00 |
| Mar. 30 | 220 | 1,000.00 | Dec. 13 | 422 | 500.00 |
| Apr. 1 | 221 | 5,000.00 | Dec. 28 | 423 | 10,000.00 |
| Apr. 21 | 230 | 2,500.00 | Dec. 28 | 424 | 10,000.00 |
| June 24 | 231 | 10,000.00 | | | |
| June 24 | 232 | 10,000.00 | *1967* | | |
| Oct. 13 | 234 | 2,000.00 | Jan. 16 | 425 | 10,000.00 |
| Dec. 16 | 250 | 3,500.00 | Jan. 16 | 426 | 10,000.00 |
| Dec. 23 | 249 | 5,000.00 | Apr. 19 | 486 | 3,000.00 |
| Dec. 30 | 251 | 6,000.00 | Apr. 21 | 485 | 5,000.00 |
| Dec. 30 | 252 | 2,000.00 | June 13 | 488 | 10,000.00 |

During his investigation, Mountain examined the bank records in an attempt to trace the disposition of the funds used to purchase these unrecorded certificates of deposit.

His report discloses:

## TABLE II

| | Certificate | | Disposition | | | |
|---|---|---|---|---|---|---|
| | No. | Amount | Deposited in Mysse Agency account | Decrease in vault cash | Credited on customers' notes | Unknown |
| 1963 | 112 | $2,977.75 | | $2,977.75 | | |
| | 124 | 4,000.00 | | 4,000.00 | | |
| | | 6,977.75 | | | | |
| 1964 | 171 | 10,000.00 | | | | $10,000 |
| | 172 | 2,000.00 | $2,000.00 | | | |
| | | 12,000.00 | | | | |
| 1965 | 220 | 1,000.00 | | 1,000.00 | | |
| | 221 | 5,000.00 | | 5,000.00 | | |
| | 230 | 2,500.00 | | | | 2,500 |
| | 231 | 10,000.00 } | | 1,295.58 | $18,704.42 | |
| | 232 | 10,000.00 } | | | | |
| | 234 | 2,000.00 | | 2,000.00 | | |
| | 250 | 3,500.00 | | | | 3,500 |
| | 249 | 5,000.00 | 5,000.00 | | | |
| | 251 | 6,000.00 } | | | | 8,000 |
| | 252 | 2,000.00 } | | | | |
| | | 47,000.00 | | | | |
| 1966 | 253 | 1,000.00 | | | | 1,000 |
| | 261 | 1,800.00 | | 1,800.00 | | |
| | 263 | 3,584.00 | | 2,500.00 | | 1,084 |
| | 411 | 10,000.00 | | | 10,000.00 | |
| | 413 | 3,000.00 | | 3,000.00 | | |
| | 412 | 5,000.00 | | | | 5,000 |
| | 414 | 3,000.00 | | | | 3,000 |
| | 415 | 1,000.00 | 1,000.00 | | | |
| | 422 | 500.00 | 500.00 | | | |
| | 423 | 10,000.00 } | 12,500.00 | | | 7,500 |
| | 424 | 10,000.00 } | | | | |
| | | 48,884.00 | | | | |
| 1967 | 425 | 10,000.00 } | 1,513.50 | | 18,486.50 | |
| | 426 | 10,000.00 } | | | | |
| | 486 | 3,000.00 | | | | 3,000 |
| | 485 | 5,000.00 | 5,000.00 | | | |
| | 488 | 10,000.00 | 7,500.00 | | | 2,500 |
| | | 38,000.00 | | | | |

The deposits in the Mysse Agency account shown in the above table, documented by duplicate deposit slips, notations thereon, and the bank ledger card for the Mysse Agency account, were subject to withdrawal only by Mysse. The documents reflect deposits in the Mysse Agency account in the amounts indicated on or about the date of the issuance of the corresponding unrecorded certificates of deposit.

The decreases in vault cash referred to in the above table occurred at or about the time the indicated unrecorded certificates were issued, usually on the same days. Vault cash is a reserve of currency kept on hand to replenish the currency supply needed in the regular course of the banking business. At the end of each day the vault cash and the cash in the hands of the tellers were counted and the total amount on hand was recorded in a cash book. In the normal operation of the bank, vault cash varied from day to day. The variations frequently amounted to $1,000 or more, and they sometimes exceeded $8,000. Changes in the amount of vault cash were the combined result of withdrawals by Mysse and normal daily fluctuations caused by the operation of the bank.

As indicated in the foregoing Table II, some of the funds received from the sale of the unrecorded certificates of deposit were credited on outstanding loans of various customers of the bank. These credits were as follows:

TABLE III

| Date | Certificate | | Loans | | |
| | No. | Amount | Principal | Interest | Customer |
| --- | --- | --- | --- | --- | --- |
| June 24, 1965 | 231 | $10,000 | $9,001.41 | $90.50 | Matt Zendt. |
| | 232 | 10,000 | 2,000.00 | 41.50 | Rae Zendt. |
| | | | 2,550.00 | 17.90 | Do. |
| | | | 1,000.00 | 3.20 | Do. |
| | | | 1,190.41 | 209.00 | Do. |
| | | | 2,500.00 | 10.50 | Do. |
| | | | [1] 18,241.82 | [1] 372.60 | |
| June 1, 1966 | 411 | 10,000 | 10,000.00 | | Paul Jones. |
| Jan. 16, 1967 | 425 | 10,000 | 789.00 | 61.00 | Walter Azur. |
| | 426 | 10,000 | 300.00 | 5.10 | Ross Kramer. |
| | | | 150.00 | 7.35 | Do. |
| | | | 1,019.00 | 90.25 | Do. |
| | | | 2,568.65 | 235.20 | Do. |
| | | | [2] 1,900.00 | 36.60 | Joe B. Lind. |
| | | | [2] 800.00 | 30.50 | Do. |
| | | | [2] 1,600.00 | 51.35 | Do. |
| | | | [2] 1,700.00 | 22.80 | Do. |
| | | | [2] 2,500.00 | 23.90 | Do. |
| | | | [2] 450.00 | 19.10 | Do. |
| | | | 3,055.00 | 238.00 | Gary Schneider. |
| | | | [2] 475.00 | 82.50 | Gary Zendt. |
| | | | [2] 260.00 | 16.20 | Do. |
| | | | [3] 17,566.65 | [3] 919.85 | |

[1] The discrepancy of $90 between the total of these amounts, $18,614.42, and the amount included in Table II of disposition of funds, $18,704.42, has not been explained.
[2] These notes were found among the records of the Mysse Agency.
[3] The total of these two items, $18,486.50, when combined with the amount deposited to the Mysse Agency account, $1,513.50, exactly equals the amount paid for the two certificates of deposit on Jan. 16, 1967, $20,000.

Notes covering the loans in Table III, which are marked footnote 2, were found among the records of the Mysse Agency. With the exception of the loans of Walter Azur and Gary Schneider, who did not maintain accounts at the bank, none of the customers' bank accounts were debited for the amounts of the loan payments purportedly made on the designated days.

The sum of $20,000 was received from the sale of certificates numbered 423 and 424 to W. E. Beals and Cleo M. Beals (hereinafter the Beals), respectively. Of this sum, $7,500 included in the "Unknown" column of Table II above, was credited to the Beals' checking account at the bank. This deposit, made on December 28, 1966, was apparently related to a debit in the same amount to the same account on November 28, 1966. The Beals had no knowledge of either transaction.

The bank's books were at all times kept in balance. The funds received by the bank for the issuance of the certificates of deposit were credited to the Mysse Agency account, withdrawn in cash, credited on outstanding loans, or credited to other asset or liability accounts of the bank.

Respondent determined that Mysse realized income from the above-described transactions involving the certificates of deposit as follows: 1963 in the amount of $12,000, 1964 in the amount of $12,000, 1965 in the amount of $47,000, 1966 in the amount of $48,884, and 1967 in the amount of $38,000. At the trial, respondent conceded that his determination for 1963 was excessive to the extent of $5,000.

Irregularities were also discovered in the bank's loan records. One such irregularity involved a transaction recorded on the bank records as a loan of $15,000 to A. T. Cunningham (hereinafter Cunningham) on October 4, 1963. Normally amounts loaned by the bank were deposited in a customer's checking account; this procedure, of course, did not apply to note renewals,[3] but it almost invariably applied with respect to new loans. Cunningham was a frequent borrower from the bank, and he always deposited the borrowed funds when he obtained a bank loan. The October 4 "loan" was not a renewal and was not deposited in Cunningham's account; he did not obtain a loan on that day. This unjustified $15,000 debit to the bank's loans outstanding account was partially used to balance unjustified credits on that day in the amounts of $13,657 and $241.65. The $13,657 was credited to Vidal Fenton's loan account as a purported payment on a note dated July 5, 1963, and the $241.65 was credited to the bank's interest account. No notation was made on Fenton's note evidencing a payment on it; such a notation was normally entered when a payment was made

---

[3] Note renewals were reflected on the bank loan records as payments of the old notes and the making of a new loan on the same day.

on a note. The disposition of the difference of $1,101.35 ($15,000 less $13,657 and $241.65) is not explained.

Similarly, the bank records indicate that a $15,000 loan to Cunningham, apparently a successor to the loan of October 4, 1963,[4] was renewed and an additional loan of $5,000 was made to him on December 2, 1965. This additional amount was not reflected as a deposit to Cunningham's checking account. The bank records further indicate that the $20,000 note was paid on October 6, 1966. There was, however, no debit entry to Cunningham's bank account on that day and he did not make that payment.

In addition, the bank records indicate that Leo DeCock borrowed the following amounts:

TABLE IV

| Date | Amount |
|------|--------|
| Oct. 20, 1964 | $5,000 |
| Mar. 3, 1965 | 3,000 |
| Sept. 15, 1965 | 4,000 |
| Oct. 12, 1965 | [1] 1,000 |
| Mar. 7, 1966 | [2] 1,000 |

[1] This entry is the combination of a $5,000 renewal of a note and a $1,000 additional loan.

[2] This entry is the combination of a $3,000 renewal of a note and a $1,000 additional loan.

No credits in these amounts were made to Leo DeCock's bank account even though he normally deposited all amounts which he borrowed. The bank records further indicate that these loans, in the total amount of $14,000, were repaid on October 6, 1966. However, no debit in that amount was made to Leo DeCock's bank account on that day. He neither borrowed the funds as indicated on the bank records nor repaid them.

As stated above, the credits of $20,000 to Cunningham's account and $14,000 to Leo DeCock's account were both made on October 6, 1966. Other credits were made on that day to various loan accounts and to the bank's interest income account in the total amount of $11,882.82. On the same day, Mysse entered into a participation agreement with Midland National Bank whereby that bank acquired a $50,000 note presumably executed by Henry DeCock in exchange for $50,000 in cash. This note was not listed as a debit on Henry DeCock's liability ledger until May 25, 1967, at which time it was repurchased from Midland National Bank. On June 13, 1967, Henry DeCock's loan account was

---

[4] The bank records indicate that loans in the amounts of $10,500, $9,000, $10,000, $4,000, $2,000, $3,000, and $15,000 (this last loan being the loan of Oct. 4, 1963) were paid May 15, 1964, through renewal notes of $27,500 and $15,000 and an additional cash payment of $14,607.35 to cover principal and accrued interest. The $15,000 renewal note was again renewed on May 5, 1965. This last note is the one which was renewed and increased on Dec. 2, 1965.

credited for $50,000 and the bank's United States Securities account was debited for a $50,000 security which never existed. Henry DeCock neither obtained the $50,000 loan on October 6, 1966, nor made payment thereof on June 13, 1967.

Respondent determined that Mysse realized income from these loan transactions as follows:

TABLE V

| Year | Amount | Source |
|------|--------|--------|
| 1963 | $15, 000. 00 | Purported loan to Cunningham. |
| 1964 | 5, 000. 00 | Purported loan to Leo DeCock. |
| 1965 | 5, 000. 00 | Purported loan to Cunningham. |
|      | 8, 000. 00 | Purported loans to Leo DeCock. |
| 1966 | 1, 000. 00 | Purported loan to Leo DeCock. |
|      | 11, 882. 82 | Payment of miscellaneous loans on Oct. 6, 1966. |
|      | 4, 117. 18 | Difference between $50,000 purported loan to Henry DeCock and amounts credited to loan and interest accounts. |

The validity of the "miscellaneous loans" on which credits were made in the total amount of $11,882.82 on October 6, 1966, is not in issue. None of the amounts credited on the loans represented payments by the customers.

Further irregularities were discovered in the bank records relating to savings accounts. During 1965, J. C. Gamble (hereinafter Gamble) redeemed several U.S. Government series E bonds and, at the suggestion of Mysse, used the proceeds, together with a check for $219.40, to open eight savings accounts for his children. Gamble deposited $2,000 in each of the accounts at the time they were opened. On April 13, 1966, Gamble deposited an additional $1,000 in each of the accounts. No bank records were found pertaining to four of those savings accounts. Respondent determined that Mysse received $4,000 of additional income during 1965 as the result of his misappropriation of the funds deposited in the four accounts for which the bank has no record.

#### ULTIMATE FINDINGS OF FACT

Mysse received at least the following amounts of unreported income from the misappropriation of bank funds during the years in issue:

| Year | Certificates of deposit | Loan transactions | Savings accounts | Total |
|------|------------------------|-------------------|------------------|-------|
| 1963 | $6, 977. 75 | $1, 101. 35 | | $8, 079, 10 |
| 1964 | 12, 000. 00 | 5, 000. 00 | | 17, 000. 00 |
| 1965 | 28, 295. 58 | 13, 000. 00 | $4, 000 | 45, 295. 58 |
| 1966 | 31, 384. 00 | 5, 117. 18. | | 36, 501. 18 |
| 1967 | 19, 513. 50 | | | 19, 513. 50 |

## Issue 2. Innocent Spouse

For at least 16 years immediately prior to his death, Mysse lived in the small town of Hysham, in Treasure County, Mont., where he served as cashier of the bank. He and Patricia had three children, Arne, Robert James, and Terry Ray. Their two sons, Arne and Robert James, were attending college during most of this period, and Mysse paid their expenses by making deposits in bank accounts which he set up for them. The family's standard of living was not noticeably higher than Mysse's income from the bank, his insurance agency, and his work as clerk of auction sales and as administrator of decedents' estates would reasonably provide.

Mysse was the only substantial money earner in the home. Patricia had no separate income and owned no income-producing property during this period. She left the business affairs of the family to Mysse. She had no specific knowledge of the amount of his income, and he cautioned her from time to time about the need for limiting family expenses.

Patricia had nothing to do with the preparation of the joint income tax returns filed for 1963 through 1966. She had no knowledge at the time she signed the returns that her husband may have been embezzling or otherwise misappropriating funds of the bank or that any other income was omitted from the returns. She trusted him and relied upon him to be honest and accurate in his business dealings, including the preparation of the income tax returns.

For 1963 through 1966, the joint returns reported the following amounts of income:

### TABLE VI

| Year | Salary | Other business income | Dividends | Total |
|------|--------|-----------------------|-----------|-------|
| 1963 | $8,700 | $9,450.26 | $1,875 | $20,025.26 |
| 1964 | 9,200 | 8,736.48 | 1,875 | 19,811.48 |
| 1965 | 9,200 | 9,081.58 | 2,000 | 20,281.58 |
| 1966 | 10,400 | 4,125.32 | 2,000 | 16,525.32 |

All of the dividend income reported in the returns was derived from 100 shares of bank stock which Mysse brought for $9,500 sometime prior to 1963.

No return was filed for Mysse for 1967. Petitioners concede that he had the following amounts of gross income during that year:

### TABLE VII

| Salary | Other business income | Long-term capital gain | Total |
|--------|-----------------------|------------------------|-------|
| $6,300 | $11,636.81 | $20,500 | $38,436.81 |

For some time prior to July 9, 1963, and continuing through September 8, 1967, Mysse and Patricia maintained a joint checking ac-

count in the First National Bank. Most of the family's living expenses were paid from this account. Prior to July 9, 1963, the account was also used in connection with the Mysse Agency business; after that date a separate account was maintained in the name of the agency, and the joint account was no longer used for business purposes. Both Mysse and Patricia drew checks on the joint account for expenses for the support of the family.

The following table shows the amounts deposited in the joint checking account and the amounts withdrawn therefrom for the support of the family from January 1, 1963, through September 8, 1967:

TABLE VIII

| Year | Deposits | Withdrawals |
|------|----------|-------------|
| 1963 | [1] $9, 549. 44 | [1] $9, 000. 00 |
| 1964 | 9, 893. 84 | 9, 840. 31 |
| 1965 | 9, 926. 68 | 9, 776. 36 |
| 1966 | 10, 641. 95 | 10, 055. 39 |
| 1967 | 11, 266. 92 | 11, 887. 22 |

[1] Estimated because prior to July 9, 1963, this account was used for both family and business expenditures.

In addition to the expenditures from the joint checking account, Mysse paid his income taxes; bore the college expenses of Arne and Robert James; made mortgage payments on the family residence acquired in 1958 by Mysse and Patricia as joint tenants; paid for merchandise purchased on charge accounts; and bought automobiles for himself, Patricia, and their sons. Some of these expenses were paid by checks drawn on the Mysse Agency account, but some of them were not. The expenditures were as follows: [5]

TABLE IX

| | 1963 | 1964 | 1965 | 1966 | 1967 |
|---|------|------|------|------|------|
| Taxes withheld | $1, 039. 20 | $989. 20 | $824. 80 | $959. 20 | $531. 90 |
| Additional tax payments | | 2, 562. 09 | 2, 191. 72 | 2, 035. 23 | 736. 66 |
| Payments to: | | | | | |
| Robert J. Mysse | 950. 00 | 2, 543. 59 | 2, 581. 61 | | |
| Arne R. Mysse | 1, 600. 00 | 3, 500. 00 | 2, 500. 00 | 1, 950. 00 | 2, 000. 00 |
| Mortgage payments | 2, 135. 95 | 1, 816. 27 | 762. 39 | 1, 304. 97 | |
| Elliots, Inc. (furniture store) | | 257. 29 | 55. 80 | | 61. 10 |
| Hart-Albin Co. (department store) | | 602. 13 | 1, 110. 79 | 731. 15 | 626. 13 |
| Angelo's (men's clothing store) | | | | | 1, 140. 65 |
| Car payments for: | | | | | |
| Olds F-85 Cutlass | | 1, 000. 00 | | | |
| Olds Jetstar I | | 1, 850. 00 | | | |
| Olds Cutlass | | | 3, 275. 00 | | |
| Olds Toronado | | | | 5, 249. 00 | |
| Olds Cutlass | | | | 1, 328. 00 | |
| Jaguar | | | | [1] 1, 000. 00 | |
| Diamond ring | | | 556. 00 | | |
| Total | 5, 725. 15 | 15, 120. 57 | 13, 858. 11 | 14, 557. 55 | 5, 096. 44 |

[1] The Olds Toronado purchased on Jan. 8, 1966, at a total cost of $6,249 was traded during 1966 on the Jaguar, which respondent requests us to find had a cost of $6,000. Why the insurance recovery received when this car was destroyed in July of 1967 was $6,135.25 has not been explained; however, we accept respondent's requested cost, and find that the Olds Toronado had a trade-in value of $5,000.

[5] The parties stipulated that "an 'option credit ledger' of Hart-Albin Company, a department store located in Billings, Montana, * * * entitled 'Arne Mysse' " may be admitted in evidence and they further stipulated to the amounts of the annual payments on that

The joint bank account and the Mysse Agency account had the following balances on January 1 of each of the years in issue:

TABLE X

|  | 1963 | 1964 | 1965 | 1966 | 1967 |
|---|---|---|---|---|---|
| Joint | $5, 655. 43 | $549. 44 | $602. 97 | $753. 29 | $1, 339. 85 |
| Mysse Agency | | 4, 874. 84 | 3, 997. 51 | 8, 312. 88 | 9, 692. 13 |

The following table compares the total amounts of Mysse's reported or conceded income with the amounts of the family's expenses:

TABLE XI

| Year | Income reported | Total expenditures | Excess expenditures [1] |
|---|---|---|---|
| 1963 | $20, 025. 26 | $14, 725. 15 | ($5, 300. 11) |
| 1964 | 19, 811. 48 | 24, 960. 88 | 5, 149. 40 |
| 1965 | 20, 281. 58 | 23, 634. 47 | 3, 352. 89 |
| 1966 | 16, 525. 32 | 24, 612. 94 | 8, 087. 59 |
| 1967 | [2] 38, 436. 81 | 16, 983. 66 | [3] (953. 15) |

[1] Amounts shown in parentheses indicate that Mysse's known income exceeded his known expenditures by such amount.
[2] No return has been filed for 1967; this amount is derived from computations of Mysse's income.
[3] This amount has been adjusted to reflect the fact that the proceeds from the sale of Mysse's bank stock (both his capital investment and long-term capital gain) were not applied to his expenditures. See text *infra*, under Transferee Liability.

Immediately prior to Mysse's death, Patricia owned no property except her interest as joint tenant in the family residence; her interest as coowner with Arne of two $10,000 certificates of deposit which Mysse had purchased with the proceeds of the sale of his bank stock; and her interest in a joint checking account with a balance of $15,-900.77 in the Security Trust & Savings Bank, Billings, Mont. (sometimes hereinafter referred to as Security account). The deposits in this account, opened October 13, 1967, included $10,000 of the proceeds of the sale of Mysse's bank stock and $6,135.25 received by Patricia as proceeds of the insurance on her automobile which was destroyed in the accident in July 1967. Patricia was also the beneficiary of a $25,000 group life insurance policy on Mysse's life. No other property owned by her or Mysse has been located.

ULTIMATE FINDINGS OF FACT

The amounts of gross income omitted from the joint income tax returns for 1963 through 1966 exceeded 25 percent of the total gross income stated in the returns. Patricia did not know of, and had no reason to know of, those omissions from income. She did not significantly benefit, directly or indirectly, from the items of gross income

account. This stipulation as to the amounts of the payments, however, was apparently based upon the annual amounts of purchases less the returns of merchandise rather than on the total amount of payments to that account. Our Findings are based upon the amounts of the annual payments shown on the option credit ledger.

omitted from the joint income tax returns. It would be inequitable to hold Patricia liable for the deficiencies in income tax for 1963 through 1966.

## Issue 3. Transferee Liability

During October 1967, Mysse sold his 100 shares of stock in the First National Bank to Edward for a total amount of $30,000. With these proceeds he purchased two $10,000 certificates of deposit in the joint names of Patricia and Arne, and he deposited the balance, $10,000, in the Security account. This bank account was carried in the joint names of Mysse and Patricia.

Between October 13, 1967, when Mysse opened the Security account, and October 29, 1967, when he died, there was deposited to this account $20,615.91 (including the $10,000 initial deposit) and withdrawn from it $4,715.14, leaving a balance in it of $15,900.77 at the time of Mysse's death. A deposit of $6,135.25, representing the proceeds of the insurance on Patricia's automobile, was made on October 26, 1967. When Mysse purchased this car in 1966 he gave it to Patricia and put title to it in her name.

In addition to the assets referred to above, the family residence on October 13, 1967, had a value of $30,000, and the Mysse Agency account at the First National Bank had a balance of $1,429.12. Mysse's liabilities included the deficiencies in income tax for 1963 through 1967. See Issue 1 *supra*.

Respondent determined (in docket No. 4329–69) that Arne R. Mysse was liable "as a transferee of assets of Arne O. Mysse (deceased) * * * for deficiencies in income tax due from Arne O. Mysse for the taxable years ended December 31, 1963, * * * [through] December 31, 1967." However, "Inasmuch as the value of the assets received by * * * [Arne R. Mysse] amounted to $20,000.00, * * * [his] liability * * * [was] limited to that amount." Respondent also determined (in docket No. 6057–71) that Patricia was liable "as a transferee of assets of Arne O. Mysse (deceased)" to the extent of the assets received by her which he determined to be $10,000. In his answer, respondent alleges that the value of the assets received by Patricia was actually $35,900.77. This amount is composed of the certificates of deposit ($20,000) and the balance in the Security account at the time of Mysse's death ($15,900.77).

### ULTIMATE FINDINGS OF FACT

Mysse was insolvent, or was rendered insolvent, on October 13, 1967, when he purchased the two $10,000 certificates of deposit for Patricia and Arne and when he made the $10,000 deposit in the Security Trust & Savings Bank. He remained insolvent to the date of his death.

OPINION

The issues for decision arise in a somewhat unusual context. Although Patricia individually had no income, she filed joint returns with Mysse for 1963 through 1966. Neither of them (nor Mysse's estate) filed a return for 1967. Respondent determined deficiencies in the income tax of Mysse and Patricia for the 4 years, 1963 through 1966. Within the statutorily prescribed 90-day period, Patricia filed a petition (docket No. 2611–69) in which she seeks a redetermination of these deficiencies. No petition has been filed on behalf of Mysse or his estate. In addition, respondent determined that Arne was liable as transferee for $20,000 of Mysse's income tax deficiencies. Arne thereupon commenced a proceeding (docket No. 4329–69) in which he placed that determination in issue. These two dockets were consolidated, and a trial was held.

Shortly after that trial was completed, Congress passed the Act of January 12, 1971, Pub. L. 91–679, 84 Stat. 2063, amending section 6013 by adding to it subsection (e). This amendment, retroactive to all 1939 and 1954 Code years, relieved, in stated circumstances, "innocent spouses" of liabilities for taxes and penalties attributable to income omitted from a joint return by the other spouse. Respondent promptly moved to reopen the record in docket No. 2611–69 for the presentation of evidence on the issues raised by the application of section 6013(e). The motion was granted.

Thereafter, on August 24, 1971, respondent issued a notice determining that Patricia was liable as transferee with respect to the deficiencies in Mysse's income taxes for 1963 through 1967. Patricia then filed a new petition (docket No. 6057–71) in which she placed this determination of transferee liability in issue, and respondent filed his answer in which he alleged still further transferee liablities. This new proceeding was consolidated with the original ones, and a further trial was held. While it is not specifically so stated in the notice of liability in docket No. 6057–71, we understand that the determination in that notice is alternative to respondent's determination in docket No. 2611–69 that Patricia is jointly and severally liable for the deficiencies for 1963 through 1966, the joint return years, but that the determination in such notice involves an additional liability with respect to Mysse's 1967 tax.

Although Mysse's estate has not been administered and no proceeding has been filed in this Court seeking a redetermination of his liabilities for 1963 through 1967, the issue as to whether he had unreported income must be considered. Section 6013(e) relieves Patricia of liability for the deficiencies in the joint returns only if she meets the requirements of that section, and those requirements include a showing that the returns omitted amounts of gross income

equal to at least 25 percent of the amount thereof shown in the returns. The issue is also important in connection with respondent's determinations that Patricia and Arne are liable as transferees.

## Issue 1. Unreported Income

Respondent has determined that Mysse misappropriated over $210,000 from the First National Bank during the 5 years, 1963 through 1967. Yet the relentless investigations by the Internal Revenue Service, the bank examiners, the FBI, and the bank's bonding company have failed to disclose any substantial accumulations of wealth or any unusual expenditures. The only assets which Mysse apparently had at his death were approximately $10,000 of the proceeds of the bank stock acquired prior to 1963, the family residence bought in 1958 on an amortizable mortgage, a group life insurance policy of which Patricia was named the beneficiary, and small additional amounts of cash. Patricia testified, truthfully we believe, that she was never aware of any misappropriations of funds by Mysse until she read in the newspaper of the investigations which followed his death.

The bank's vice president, director, and major shareholder, who was a neighbor of the Mysses in the small town of Hysham, Mont., and who knew the approximate amount of Mysse's income, testified that he never thought the family spent more than their income would justify. And the undisputed testimony is that Mysse did not expend large amounts in the pursuit of gambling or other expensive habits. If Mysse misappropriated the bank's money, nothing in the record discloses what he ultimately did with it.[6]

Mindful of the difficulties inherent in proving a negative—that Mysse did not have unreported income—we think the foregoing facts constitute a prima facie showing that respondent's determinations were erroneous. Cf. *Weir* v. *Commissioner*, 283 F.2d 675, 679 (C.A. 6, 1960). We think this evidence was enough to cast on respondent the burden of presenting other evidence sufficient to show that Mysse did, in fact, receive unreported income. Cf., e.g., *Potts, Davis & Co.* v. *Commissioner*, 431 F.2d 1222 (C.A. 9, 1970), affirming a Memorandum Opinion of this Court; *Commissioner* v. *Smith*, 285 F.2d 91, 95–96 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court.

---

[6] A lawyer-neighbor of the Mysses, who prepared Mysse's income tax returns for several years, testified that the Mysse family lived better than his family was able to live on approximately the same amount of income. However, he did not indicate that this "higher standard of living" even approximated that which a man having three times his reported income (Mysse's reported income was about $20,000 per year and respondent determined his actual income was about $60,000 per year) would enjoy. Furthermore, this witness displayed a hostile attitude which, we infer, stemmed from a disagreement with Mysse several years previously. We have given his general testimony little weight.

Notwithstanding the absence of evidence showing what he did with the funds, we think respondent has established that Mysse embezzled a substantial amount of the bank's money during each of the years 1963 through 1967. As shown in our Findings, the evidence demonstrates that 38 certificates of deposit were issued to various customers in the name of the bank; that money was paid to the bank by those customers in the amounts of the certificates of deposit; that Mysse personally handled the transactions in which the certificates were issued; and that the file copies of 36 certificates were not located in the bank's records but after Mysse's death were found in the Mysse Agency records at his home. Notations relating to two additional certificates were also found among those records.

In some instances, microfilm copies of the checks which the bank's customers used to pay for the certificates were located; in other instances, the customers' accounts at the bank were debited for the amounts of the certificates. However, the bank's daily blotters failed to reflect the issuance of any of the certificates. If the failure to record the certificates on the daily blotters had been due to error, the receipt of funds by the bank would have caused its accounts to be out of balance. The debit entry reflecting the increase in the bank's cash on hand would not have been balanced by the normal credit to the bank's outstanding savings certificates of deposit account. Instead of crediting the proper account, the bank's books were kept in balance by improperly crediting its other asset or liability accounts—i.e., the cash on hand was reduced, the balance in the Mysse Agency account was increased, or the loans receivable accounts were decreased. The only reasonable inference, we think, is that Mysse made these entries in order to hide his misappropriations of funds.

In our Findings of the amounts of omitted income, we have not included four items listed in Table II: $18,704.42, related to certificate Nos. 231 and 232; $10,000, related to certificate No. 411; $7,500, related to certificate Nos. 423 and 424; and $18,486.50, related to certificate Nos. 425 and 426. In each case the bank received the amounts represented by the certificates, but the entries made to balance the bank's books indicate that the above-specified sums neither left the bank nor were credited to any of Mysse's bank accounts. The bank books were kept in balance by crediting various notes receivable and the Beals' checking account. Thus, Mysse did not appropriate to his use these amounts of the proceeds of the certificates. Respondent argues that by marking the bank's notes paid in whole, or in part, Mysse realized income. But we think it more reasonable on this record to conclude that these credits were used either to cover up previous mis-

appropriations [7] or to provide a reservoir which Mysse could have used for later misappropriations.

In any event, since Mysse's liability is not before the Court and we find that Patricia is not liable by reason of section 6013(e) for the 1963 through 1966 joint return deficiencies, we need not establish the precise amounts of Mysse's misappropriations. The amounts which we have found are sufficient to enable Patricia to meet the 25-percent omission requirements of section 6013(e)(1)(A), and to enable respondent to meet the similar requirements of section 6501(e)(1) for the purpose of applying the 6-year statute of limitations to Mysse's liability in connection with Patricia's transferee proceedings in docket No. 6057–71. Moreover, the tax deficiencies resulting from our Findings of the amounts of unreported income exceed the amounts of income tax liabilities needed to support respondent's transferee claims against Patricia and Arne.[8]

## Issue 2. Innocent Spouse

Patricia seeks to be relieved of liability for the deficiencies in income tax reported in the joint returns for 1963, 1964, 1965, and 1966 under the so-called innocent-spouse provisions of the recently enacted section 6013(e).[9]

---

[7] The testimony discloses that the bank's claim against the bonding company for reimbursements of Mysse's misappropriations totaled $414,445.50. The bonding company actually paid the bank approximately $380,000.

[8] In making our Findings, we have borne in mind that in docket Nos. 2611–69 and 4329–69 petitioners have the burden of proving that the deficiencies in Mysse's income tax were less than those determined by respondent. Rule 32, Tax Court Rules of Practice. In docket No. 6057–71, Patricia has a similar burden as to Mysse's 1967 taxable year since he failed to file any return for that year. Secs. 6501(c)(3) ; 6901(c)(1). We are also cognizant of the fact that in docket No. 6057–71 respondent has the burden of proving that Mysse omitted from his returns for 1964 through 1966 amounts in excess of 25 percent of the amounts of gross income stated in such returns, secs. 6501(e)(1)(A), 6901(c)(3), *Elsie SoRelle*, 22 T.C. 459, 486 (1954), acq. 1955–1 C.B. 6, and that in docket Nos. 4329–69 and 6057–71 he has the burden of proving that the total amount of Mysse's liabilities—here alleged to be only his tax liabilities—exceeded the total amount of his assets at the times he made the transfers involved, sec. 6902(a). Viewing the evidence in the light most favorable to petitioners and placing the burden of proof upon respondent as to all issues involving the amount of Mysse's income tax liability, we have made our Findings in terms of the minimum amount of Mysse's tax liability. This is obviously not prejudicial to petitioners, and it is not prejudicial to respondent because such Findings result in his recovering the full amount of the assets transferred to petitioners—the only amount which he is entitled to recover under our view of the law. Such Findings as to the minimum amount of Mysse's tax liability are not intended to prevent respondent from collecting the full amounts of the determined liabilities should any additional assets of Mysse be discovered.

[9] SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

　(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—

　　(1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, if—

　　　(A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable

See *Jerome J. Sonnenborn*, 57 T.C. 373 (1971). To qualify her for such relief the evidence must show for each year:

(1) That there was omitted from gross income an amount properly includable therein which is attributable to Mysse and which is in excess of 25 percent of the amount of gross income stated in the return;

(2) That in signing the return she did not know of, and had no reason to know of, the omission; and

(3) That she did not significantly benefit directly, or indirectly, from the items omitted from gross income and that it would be inequitable to hold her liable for the deficiency.

As shown in our Findings on issue 1, the evidence demonstrates that Patricia meets the first requirement, and respondent concedes that she did not know of the omissions. However, pointing to the amount by which the family's expenditures exceeded its reported income, respondent has refused to grant Patricia the benefits of section 6013(e) on the grounds that she had reason to know of the omissions and that it would not be inequitable to hold her liable. We think respondent misinterprets the facts.

Respondent contends that the family's expenditures so substantially exceeded its income each year that Patricia should have been alerted to the misappropriations. In making the computations to support this thesis, however, he has made several errors. He assumed that the sons' college expenses were paid with funds other than those passing through the joint account whereas, in fact, some of the expenses for 1963 were paid with checks drawn on such account. He assumed that all the available funds (the balance in the joint account on January 1, 1963, plus Mysse's reported income for that year) not shown to have been spent during 1963 and not in the joint account at the end of the year were, in fact, spent during the year for unidentified purposes. He used this unwarranted assumption to disregard the funds on deposit at the beginning of each year in the Mysse Agency account. For 1966, his computation assumed cash purchases of both an Oldsmobile automobile ($5,249) in the early part of the year and a Jaguar automobile ($6,000) later in the year. The testimony, however, clearly shows that

therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,

(B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and

(C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.

**698**

the Oldsmobile automobile was traded for the Jaguar with an additional cash outlay which we have estimated at only $1,000.

However, the fact remains, as shown in Table XI of our Findings, that for 3 of the 4 years involved in this case Mysse overspent his known current income. Whether these excess expenditures were sufficient to give Patricia reason to know of Mysse's omitted income is the question we are called upon to answer. In answering this question, we are mindful that the Senate committee report accompanying the Public Law which added section 6013(e) states that, to the extent the omitted income is used for the "ordinary support of the innocent spouse," she has not benefited from such income within the meaning of the statute. S. Rept. No. 91-1537, 91st Cong., 2d Sess. (1970), p. 3, 1971-1 C.B. 607. From this explanation, we think it reasonable to conclude also that such use of the unreported income does not ordinarily give the spouse reason to know of the income's existence within the meaning of the statute:

Looking to the facts of this case, we see a family with two sons in college during most of the years in issue and with the head of the family suffering from a terminal illness during at least part of the period. We further see a family, residents in a small town (with a population of 373 in 1970),[10] whose spending habits raised not the least suspicion in a very interested observer—the director, vice president, and major stockholder of the bank. Moreover, the head of the family, Mysse, was evidently a master of deceit; he was able to embezzle hundreds of thousands of dollars over a period of years without exciting the suspicion of either the officers of the bank or its auditors. Respondent has suggested no reason why Patricia, a housewife without business knowledge, should have known more about the bank's losses than these businessmen having pecuniary or professional interests in the bank.

Patricia knew, or reasonably could have known, that only about one-half of the family's income was deposited in the joint checking account to which she had access. Since Mysse retained the other half, presumably in the Mysse Agency account, Patricia had no reason to be surprised that he made substantial payments, referred to in Table IX of our Findings, with funds other than those in the joint checking account. Furthermore, the nature of such expenditures—(1) Mysse's Federal income tax; (2) the sons' college expenses; (3) mortgage payments on the family's residence; (4) bills charged at a furniture store and a department store which exceeded $1,000 only in 1965; (5) the purchases of automobiles for members of the family; and (6) in 1965, a $556 diamond ring for Patricia to replace an older one—was not of

---

[10] 1970 U.S. census figures as reported in Rand-McNally Road Atlas, 47th ed., p. 108.

such character as to cause a reasonably prudent person with Patricia's knowledge of the family finances to question the source of the funds.

Even assuming that Patricia knew the family was spending more than its current income, which we do not think is true, she had no reason to know that such excess was derived from unreported income. She knew, or might have known, that the balance in the joint bank account at the beginning of 1963 was $5,655.43 and that this balance was likely to have been augmented by the $5,300.11 by which the family underspent Mysse's income during that year. As far as she knew, or reasonably might have known, there was at the end of 1963 a total of $10,955.54 available for expenditure in 1964 and later years. How much of this money was retained in the Mysse Agency account, which was opened during 1963, she had no way of knowing and no reasonable means of ascertaining. Respondent's assumption that most of these excess funds were expended during 1963 is clearly unreasonable, at least in the light of Patricia's knowledge. Patricia could reasonably have assumed that the expenditures during 1964, 1965, and 1966 which exceeded the family's current income for those years (a total for all 3 years of $16,589.88) were at least partially made with the excess funds available at the end of 1963 ($10,955.54). She might also reasonably have expected Mysse to have borrowed funds during this period of financial strain for the family.

To be entitled to the benefits of section 6013(e) a spouse is not required to have perfect knowledge of the family's finances; nor is she required to see that the family maintains a balanced budget; however, she cannot close her eyes to unusual or lavish expenditures. In this case, we find no lavish expenditures. Patricia had no reason to know of Mysse's unreported income.

Nor do we think that Patricia significantly benefited from the unreported income within the meaning of section 6013(e)(1)(C). Notwithstanding the extensive investigations (following Mysse's death) by the FBI, the bank examiners, the bank's bonding company and independent examiner, and the Internal Revenue Service, no one has been able to trace the misappropriated funds. Thus there is apparently no accumulation from which she can benefit. And we think that any benefit which Patricia received from the funds constituted no more than ordinary support. As pointed out above, this does not mean that she "significantly benefited" within the meaning of the section.

Respondent, emphasizing that the Mysses had an apparently harmonious marital relationship, argues that the relief provisions of section 6013(e) were intended primarily for the benefit of spouses who are deserted, divorced, or separated. Since Patricia was not placed in any of these circumstances, respondent argues that it would not be

inequitable, within the meaning of the statute, to hold her liable for the tax. S. Rept. No. 91-1537, 91st Cong., 2d Sess. (1970), p. 3, 1971-1 C.B. 608.

We find nothing in the section, however, to indicate that its relief was intended to be limited to spouses who are victims of broken marriages. Indeed, the committee report referred to above indicates that whether the innocent spouse has been separated or divorced is only one of the factors to be considered in determining whether it is inequitable to hold her liable for the deficiencies. In any event, Patricia did not discover that Mysse was misappropriating funds until after his death. Is she to be denied the relief because Mysse was so clever as to conceal the unreported income from her? We do not think so. Nor is she to be denied relief because Mysse died rather than deserted or divorced her.

Respondent concedes that Patricia knew nothing about the misappropriations of bank funds and she testified, truthfully we believe, that she left the family business affairs to Mysse. When the deficiency assessments were made, the bank denied her and her attorney access to its records because of possible adverse interests. None of the information accumulated by the Federal investigative agencies, including the Internal Revenue Service, was willingly made available to her. Moreover, jeopardy assessments were made and liens were filed against the assets otherwise available to her. She was at as great a disadvantage in the litigation of the liability here in issue as she would have been if she and Mysse had been separated or divorced. We find respondent's argument to be without merit.

In summary, not only did Patricia have no reason to know of the omissions from income, she did not significantly benefit from such omitted income. It would be inequitable to hold her liable for the deficiencies. This is exactly the kind of situation section 6013(e) was intended to cover, and Patricia is entitled to its benefits.

## Issue 3. Transferee Liability

Respondent's determinations that Patricia and Arne are liable as transferees relate to the two $10,000 certificates of deposit purchased with the proceeds of the sale of Mysse's bank stock and the balance of $15,900.77 in the joint account in the Security Trust & Savings Bank at Mysse's death. The transferee claims are not related to the family residence or the group life insurance proceeds.

Section 6901(a)(1)(A) authorizes the assessment of transferee liability, at law or in equity, in the same manner as the liability for income taxes. This provision, however, does not create any separate liability; it merely provides a secondary method for enforcing the

existing liability of the transferor. *C.B.C. Super Markets, Inc.*, 54 T.C. 882, 897–898 (1970). The substantive question of whether a transferee is liable for the transferor's obligation and the extent of his liability depends upon State law. See, e.g., *Commissioner* v. *Stern*, 357 U.S. 39, 45 (1958). Since section 6901 is purely procedural, the steps taken under that section to enforce a transferee's liability may be viewed as a substitute for the pursuit of the remedies available to respondent under Montana law. *Patterson* v. *Sims*, 281 F.2d 577, 580 (C.A. 5, 1960).

To support his claim, respondent relies upon the following provisions of section 29–104, Mont. Rev. Codes Ann. (1947) :

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

For purposes of this section, a person is insolvent "when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." Mont. Rev. Codes Ann. sec. 29–102 (1947). In making a determination as to whether a person is insolvent within the meaning of this section, any property liable for any of his debts is to be included as one of his assets. Mont. Rev. Codes Ann. sec. 29–101 (1947).

Petitioners have conceded that Mysse had total assets in the amount of $46,429.12 immediately preceding the first transfers—the purchases of the two certificates of deposit and the creation of the Security account.[11] These assets consisted of the $30,000 proceeds of the sale of the First National Bank stock; a $15,000 interest in the family residence, and $1,429.12 in the Mysse Agency account. His assets did not increase between the date of that transaction and his death.

The only liabilities Mysse is shown to have had are the income tax deficiencies at issue in this proceeding. Even though those deficiencies had not been assessed, they are to be taken into account in determining whether he was insolvent when the transfers were made. See *Scott* v. *Commissioner*, 117 F.2d 36 (C.A. 8, 1941). The deficiencies and penalties determined by respondent exceed $115,000, a sum much greater than the value of Mysse's assets. While we have made some adjustments in respondent's determinations of taxable income and the calculation of the precise amounts of the deficiencies under our Findings will necessarily await the Rule 50 computations, we are satisfied that the tax liabilities exceed $46,429.12. Mysse was, therefore, insol-

---

[11] They also concede that his total assets immediately following these transfers did not exceed $26,429.12.

vent at the time all the disputed transfers were made. *Kreps* v. *Commissioner*, 351 F.2d 1, 10 (C.A. 2, 1965), affirming 42 T.C. 660 (1964).

As to the certificates of deposit, Mont. Rev. Codes Ann. sec. 29–109 (1947),[12] provides that, in the case of a fraudulent conveyance, a creditor may have "the conveyance set aside" or disregard "the conveyance and attach or levy execution upon the property conveyed." Assuming the existence of tax deficiencies on the part of Mysse, we do not understand that either Patricia or Arne seriously contends that respondent may not reach these two certificates and the interest paid or payable thereon. We think it quite clear that, as to them, transferee liability must be sustained.

As to the Security account balance ($15,900.77), we do not think respondent has carried his burden, sec. 6902(a), of showing that $6,135.25 of that balance was Mysse's property. The evidence shows that this latter sum, deposited in the account on October 26, 1967, only 3 days before Mysse's death, represented the amount received from a damage claim under an insurance policy covering a Jaguar automobile. Contrary to respondent's contention, Mysse had given this automobile to Patricia and placed title to it in her name when he purchased it in 1966. Respondent, who has the burden of proof on this issue, does not contend that Mysse was insolvent at the time he made that gift. Since Patricia owned the automobile, she also owned the proceeds of the insurance thereon. Consequently, only $9,765.52 ($15,900.77 less $6,135.25) of the funds in the Security account may be the subject of transferee liability.

Relying upon *Tooley* v. *Commissioner*, 121 F. 2d 350 (C.A. 9, 1941), reversing *Estate of Carrie M. Botts*, 42 B.T.A. 977 (1940), Patricia contends that the funds in the Security account were not transferred to her within the meaning of the applicable Montana law. She asserts that Mysse did not transfer to her the funds in that account either when he deposited them or when he died. If she is correct in her analysis, the result would be most anomalous; in a mere 16-day period Mysse, while insolvent, was able to put nearly $10,000 beyond the reach of his creditors and in the hands of his wife without subjecting her to any possible transferee liability. We do not think that *Tooley* supports that result.

---

[12] Sec. 29–109. *Rights of creditors whose claims have matured.* (1) Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser,

(a) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or

(b) Disregard the conveyance and attach or levy execution upon the property conveyed.

In *Tooley*, the court reasoned that a surviving joint tenant's interest does not stem from a transfer which occurs at the time of the other joint tenant's death; rather such interest is derived from an expansion of the survivor's already existing rights. This expansion occurs by operation of law, said the court, and does not constitute a transfer for the purposes of determining transferee liability. However, this expansion of rights theory assumes that there was initially a transfer of rights to be expanded, and in *Tooley* the court was careful to point out that the transferor was not alleged to have been insolvent when the joint tenancy was created.[13] In the instant case, however, Mysse was insolvent when the Security account was opened. The creation of the joint account was, therefore, constructively fraudulent and Patricia is liable as a transferee to the extent of the $9,765.52.[14] Mont. Rev. Codes Ann. sec. 29-109(a) (1947); see *Ethel Hamilton Nau*, 27 T.C. 999 (1957), affd. 261 F. 2d 362 (C.A. 6, 1958); Plumb, "Federal Tax Collection and Lien Problems," 13 Tax L.Rev. 259–260 (1958).

Finally, we are called upon to determine the extent of Patricia's transferee liability with regard to the Security account. Such liability is limited to the lesser of the amount of Mysse's Federal income tax liability, including penalties and interests as determined under Federal law, or the value of the assets transferred, together with any interest in respect of such assets as is provided by State law. *Leo L. Lowy*, 35 T.C. 393 (1960). Since the amount of Mysse's tax liability exceeds the value of the assets transferred, the limit on Patricia's transferee liability is that determined by State law. The "determination of the existence, starting date, and rate of interest upon the retention of * * * [the transferred] assets" is controlled by Montana law. *Estate of Samuel Stein*, 37 T.C. 945, 961 (1962); *Patterson* v. *Sims, supra.*[15]

The parties agree that section 17–204, Mont. Rev. Codes Ann. (1947), which is, in part, as follows, determines the period for which interest is payable by a transferee under Montana law:

---

[13] Since *Tooley* v. *Commissioner*, 121 F.2d 350 (C.A. 9, 1941), is so readily distinguishable from the present case, we need not consider whether this Court will follow the holding of that case in other similar ones. Cf. *Jack E. Golsen*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (C.A. 10, 1971).

[14] The record shows that, pursuant to the jeopardy assessment, respondent filed a tax lien against this account on Apr. 8, 1969, but does not show the balance in the account at that time. The amount in the account on that date may, of course, be applied to reduce her transferee liability.

[15] In some of the decided cases, the courts have treated a notice of transferee liability as a notice and demand and have stated that liability for interest after the notice has been issued is controlled by the internal revenue laws. *Patterson* v. *Sims*, 281 F.2d 577, 580–581 (C.A. 5, 1960); *Estate of Samuel Stein*, 37 T.C. 945, 959 (1962). Since respondent's transferee claim with respect to this bank account stems from his answer in docket No. 6057–71 rather than a notice of liability, those cases are not apposite here.

Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, * * *

The only point on which the parties disagree is whether, within the meaning of this statute, the amount of Patricia's transferee liability was "capable of being made certain by calculation" prior to the decision of this Court.

Under this statute, it has been held that "interest is not allowable until the exact amount due is ascertained (or ascertainable by mathematical computation), so that payment or tender could have been made at the proper time." *Eskestrand* v. *Wunder*, 94 Mont. 57, 20 P.2d 622, 625 (1933) ; see also *Wyant* v. *Dunn*, 140 Mont. 181, 368 P.2d 917 (1962) ; *Daly* v. *Swift & Co.*, 90 Mont. 52, 300 Pac. 265, 269 (1931). Where it takes a judgment of a court to determine the exact liability and such judgment could not be rendered until all the evidence was considered and weighed, "the claim was not ' "certain" nor could be made certain by mere "calculations." ' " *United States* v. *George A. Fuller Co.*, 250 F. Supp. 649, 664 (D.Mont. 1966). Similarly, in California, the State from which Montana's statute was derived, it has been held that the amount of a liability is not ascertainable for purposes of this statute so long as there is a bona fide dispute as to the liability, *Lineman* v. *Schmid*, 32 Cal.2d 204, 195 P. 2d 408, 411–413 (1948) ; *Distefano* v. *Hall*, 263 Cal.App.2d 380, 69 Cal.Rptr. 691, 697–698 (Ct.App. 1968) ; or where the debtor lacked information sufficient to enable him to compute the amount of his liability, *Republic Indemnity Co.* v. *Maier Brewing Co.*, 249 Cal.App.2d 495, 57 Cal. Rptr. 670, 674 (Ct.App. 1967) ; *McConnell* v. *Pacific Mutual Life Insurance Co. of Cal.*, 205 Cal.App.2d 469, 24 Cal.Rptr. 5 (Dist.Ct. App. 1962). Cf. also *Maynard Hospital, Inc.*, 54 T.C. 1675, 1678 (1970), on appeal (C.A. 9, Dec. 4, 1970, and Jan. 11, 1971).

In the light of these precedents, we hold that the amount of Patricia's liability was not ascertainable prior to the decision of this Court in the present proceeding. Her liability, of course, depends on the liability of Mysse. She did not concede that liability and, indeed, presented substantial evidence to show that he had no such liability. Furthermore, the extent of Patricia's liability as transferee depended on the amount of Mysse's unpaid tax liability and, prior to the trial of this case, she lacked information from which she could compute his liability. Under the rules laid down by the foregoing authorities, her transferee liability was neither "certain" nor "capable of being made certain by calculation" prior to the trial of this case, and therefore no

interest is allowable under section 17–204, Mont. Rev. Codes Ann. (1947).[16]

Consistent with the conclusions expressed in this Opinion,

*Decisions will be entered under Rule 50.*

---

[16] Sec. 17–205, Mont. Rev. Codes Ann. (1947), is as follows:

*In actions other than contract.* In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury.

In some other States, similar provisions have been held applicable to determine the amount of liability payable in cases involving fraudulent transfers. See, e.g., *Patterson* v. *Sims,* 281 F. 2d 577 (C.A. 5, 1960) ; *Gelinas* v. *Buffum,* 67 F. 2d 380 (C.A. 9, 1933). If we were to apply this statute to the present case our conclusion would be the same. Constructive rather than actual fraud is here involved. *Patterson* v. *Sims, supra* at 580. Furthermore, Patricia has been deprived of the use of the transferred and other funds since April 1969, when respondent made the jeopardy assessment and asserted liens against all her property. We think it would be inequitable to require Patricia to pay interest on the funds which respondent has prevented her from removing from the non-interest-bearing Security account.