WILLIAM M. HACKNEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Hackney v. Commissioner
Docket No. 1813-74.
United States Tax Court
T.C. Memo 1976-99; 1976 Tax Ct. Memo LEXIS 302; 35 T.C.M. (CCH) 420; T.C.M. (RIA) 760099; March 30, 1976, Filed E. M. Murray, for the petitioner. Matthew W. Stanley, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies and additions to tax: Year
Deficiency
Section 6653(b)
additions
1967
$ 1,540.00
1968
6,865.11
$ 3,432.56
1969
20,056.92
10,028.46
Petitioner does not dispute the amount of the deficiencies. The only issues *303 for decision are (1) whether petitioner qualifies as an "innocent spouse" under section 6013(e) [1] so as to be relieved from liability for the deficiencies resulting from omitted gross income on joint returns filed with his wife for 1968 and 1969, [2] and (2) if petitioner is not relieved from liability under section 6013(e), whether petitioner fraudulently intended to evade tax in 1968 and 1969. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, William Hackney, resided in Port Angeles, Washington, when he filed his petition. Petitioner had only limited formal education, having dropped out of high school after three months. He worked on local farms until he was eighteen years old, and then began driving logging trucks. Except for two years in the Army, petitioner has been a logging truck driver in the States of California and Washington since 1950. Petitioner and Verna Petty were married in February 1964. At that time, Verna owned and operated a restaurant. *304 Petitioner's only assets when he married Verna were a Dodge pickup truck and his clothes. In 1965 Verna sold her restaurant business [3] and petitioner and Verna formed a log hauling business, which they operated as a sole proprietorship under the name Mac Hackney Logging ("proprietorship"). Thereafter, in 1965, petitioner and Verna purchased a 1964 Mack diesel truck and trailer on the installment basis, paying as a down payment $1,200 cash plus petitioner's Dodge pickup. The bulk of the proprietorship's business was hauling logs from the woods to yards for export or to domestic mills for processing. The proprietorship was compensated according to rates established by the Washington Common Carrier Commission, computed either on a trip basis or on a board feet per mile basis. Prior to forming the proprietorship, petitioner and Verna had had a joint checking account. After forming the proprietorship they opened, in addition, a separate checking account for the proprietorship under the name of "Mac Hackney." The checkbook was used to keep an accurate accounting of business expenses. The *305 proprietorship required its drivers to use trip tickets to record the name of the logger, the point of origin and the point of delivery. The proprietorship kept the trip tickets and also scale receipts. Petitioner did not have any bookkeeping or accounting experience, and in the past his Federal income tax returns had been prepared by a bookkeeper or by his mother. As a result, Verna did all the bookkeeping and billing for the business. She billed the various loggers, deposited payments for the hauling services, maintained the checkbook, paid business expenses (including interest payments on purchase contracts for equipment), took care of the business payroll, filed excise and use tax reports with the State of Washington, and compiled data to present to the accountant who prepared their Federal income tax returns. Petitioner was aware that various records were maintained for the business, but Verna handled all the financial records. [4] Petitioner and Verna looked over and signed the Federal income tax returns prepared by the accountant. *306 Petitioner's business responsibility entailed purchasing equipment, securing the hauling jobs, scheduling the drivers, driving trucks himself, handling truck maintenance, and picking up the trip tickets and the scale receipts which he brought to the office for recording. During 1966 or 1967 Verna worked for the West Coast Orient Company ("WCO"), a log exporting company, and she continued to work for that company through 1971. Verna's duties at WCO basically involved bookkeeping and clerical functions. She worked directly for Robert Burrows ("Burrows"), who was WCO's local manager in Aberdeen, Washington. While she worked at WCO, she continued to handle the proprietorship's books and records. WCO processed and sold certain non-exportable cedar logs to shake mills on the Olympic Peninsula. WCO used the proprietorship, among others, to haul these non-exportable logs from its yard to various shake mills, including the Brothers Four Shake Mill in Moclips, Washington. The normal practice was for the shake mills to pay WCO directly for the logs, and WCO in turn to pay the trucking companies for their services. Verna normally received the purchasers' payments for the WCO logs. The *307 sales receipts were posted to WCO's books and records, and provision was made for depositing the payments. WCO paid the proprietorship on a trip basis for the hauling that was done from the WCO yard to the shake mills. The trip price was negotiated between petitioner or Verna and Burrows. In 1968 and 1969 Burrows arranged to sell WCO's non-exportable logs to the Brothers Four Shake Mill in Moclips. By arrangement with Verna, the sales were made under the name Mack Trucking. Payments for these logs were received by Verna at WCO. When Verna received the checks from the Brothers Four payable to Mack Trucking she, at the direction of Burrows, appropriated the checks by depositing them in one of three places: [5] Most of the checks were deposited in petitioner's and Verna's two checking accounts (joint and business) maintained at the Pacific National Bank of Washington. Some checks were deposited in Verna's and petitioner's savings account with the Aberdeen Federal Savings and Loan Association, and applied to a mortgage on the residence which petitioner and Verna built in 1969. During 1969 *308 there was also an arrangement whereby Burrows acquired logs from different sources and sold them to WCO under the name of Verna Petty (Verna's prior name). From that activity, Verna deposited $17,930.18 to a checking account under the name of Verna Petty and $6,800 was paid to certain individuals at Burrows' instructions, namely, a check for $5,500 was paid to Robert Bailey ("Bailey") as a gift on September 15, 1969, and $1,300 was paid to Nancy Love (an employee of WCO) on December 19, 1969. Verna married Bailey after divorcing petitioner. In 1969 Verna also opened a checking account under the name of Mrs. J. Eckles. The account was used by Burrows to purchase logs for resale to WCO under a written contract between "J. Eckles" and WCO. The following checks, totaling $7,500.85, were written on the account: (1) $400 to Becky Jarvela (an employee of WCO) on August 22, 1969; (2) $2,500.85 to Verna Hackney on June 14, 1969; and (3) three checks, $2,500, $1,200 and $1,500, to Ted Stump on July 3, 1969, May 13, 1969, and May 14, 1969, respectively. One of the checks to Stump paid for a lot next door to Verna's and petitioner's new home that Verna purchased. During the years at issue *309 petitioner was not aware that logs were being sold from the WCO yard to Brothers Four under the name of Mack Trucking. Because of his lack of familiarity with financial transactions, petitioner never questioned Verna's accounting. Further, petitioner knew nothing about the Petty and Eckles accounts. Petitioner first learned about the Petty account and Verna's activity with Burrows when he was interviewed by a revenue agent in mid-1971. Petitioner first learned about the Eckles account after the return for 1969 was filed, but prior to his meeting with the revenue agent. Prior to the years at issue, the proprietorship owned at least three logging trucks and trailers. In 1968 petitioner and Verna purchased a 1965 Diamond T Truck, a 1965 General Trailer, a 1968 Diamond Reo Truck, a 1967 Kenworth Truck, a 1968 Mack Truck and Pierce Trailer, and a 1969 Ford pickup, all for very little cash down (and in some instances for only an old truck or truck and trailer down) and modest installment payments. In addition petitioner and Verna purchased a truck shop (land for $3,015, and shop for $10,450) and a lot to build a house on ($3,050) for cash. In 1969 petitioner and Verna purchased a 1969 *310 Mack Truck and General Trailer, a 1969 Kenworth Truck, repurchased their old 1967 Kenworth Truck, and a 1969 Pierce Log Trailer, again all for very little cash down (and sometime only an old truck or truck and trailer down) and modest installments payments. In addition they bought some real estate with another couple ($1,500), furnished their new home ($2,500), and Verna, without petitioner's knowledge, paid off the mortgage on the new house. [6]
Other minor expenditures during the years in issue included recarpeting the old home (before trading it in on the new), flying petitioner's children by a prior marriage from their home in northern California to Washington State to visit petitioner one or two times, buying a motorcycle, and taking a vacation trip to Reno. Petitioner's and Verna's cash flow during the years at issue was $43,822.34 during 1968 and $52,194.85 during 1969. 6a
Sometime prior to September 10, 1969, petitioner filed for a divorce from Verna. Verna answered and cross-claimed against petitioner. On October 20, 1969, petitioner and Verna *311 executed a property settlement agreement, and on January 30, 1970, the Superior Court of the State of Washington for the County of Grays Harbor granted Verna a divorce on her cross-complaint and approved and confirmed the property settlement agreement. The division of property resulted more from petitioner's acquiescence to Verna's demands for certain items than from arm's length negotiations wherein the parties were careful to take into account the specific values of the items. The property settlement agreement provided that the assets would be divided as follows: To Petitioner Item
Fair Market Value
Amount Owing
Net Value
1969 Mack Logging
Truck and General
trailer
$25,000
$25,000
$ 0
1969 Kenworth logging
truck and trailer
25,000
24,468
532
1967 Kenworth logging
truck and trailer
19,500
15,000
4,500
shop tools and
equipment
500
0
500
1969 Ford pickup
truck
2,800
2,127
673
1/2 interest in
Sullivan property
2,000
0
2,000
cash (for interest
in truck shop)
10,000
0
10,000
TOTAL
$18,205
To Verna
1968 Thunderbird
$ 3,700
$ 0
$ 3,700
1967 Mack logging
truck and trailer
18,000
12,492
5,508
1968 Mack logging
truck and trailer
23,000
22,960
40
1968 Diamond Reo
logging truck and
trailer
22,000
17,713
4,287
truck shop
15,000
0
15,000
home property
22,000
0
22,000
lot next to
home property
2,500
0
2,500
furniture
2,500
0
2,500
TOTAL
$55,535
*312 After the divorce both petitioner and Verna each remained in the log hauling business. In 1970, WCO discovered the Brothers Four transactions, and on March 10, 1970, Verna executed a note to WCO in the amount of $48,724.20, which note was secured by a mortgage on Verna's home and logging trucks which she received as a result of the property settlement agreement. Petitioner did not sign the note and mortgage and WCO did not contact petitioner in an attempt to collect any of the funds from petitioner. ULTIMATE FINDINGS OF FACT
Petitioner and Verna filed joint returns for 1968 and 1969. In each return the omitted income exceeded 25 percent of the gross income stated in the return. Petitioner did not know or have reason to know of the omissions of income from the 1968 and 1969 tax returns. Petitioner did not significantly benefit from the items omitted from gross income, and, taking into account all of the facts and circumstances, it would be inequitable to hold petitioner liable for the deficiency in tax for 1968 and 1969 attributable to such omissions. OPINION Petitioner claims he should be relieved from liability for the taxes on the income omitted from his and his wife's *313 joint returns for the years 1968 and 1969 under section 6013(e) [7] because (1) in signing the returns petitioner did not know of, or have reason to know of, the omissions, and (2) petitioner did not significantly benefit from the items omitted and it would be inequitable to hold him liable for the deficiency. Petitioner further asserts that even if he does not meet the requirements of section 6013(e), the fraud penalty is inapplicable to him since no part of the underpayment was due to fraud on his part. *314 Respondent contends that (1) in signing the 1968 and 1969 joint tax returns, petitioner had reason to know of, and in fact did know of, substantial income omissions, and (2) since petitioner significantly benefited from his and Verna's receipt of the unreported income, it would not be inequitable to hold him liable for the deficiency. Furthermore, respondent contends that petitioner is subject to the 50 percent fraud penalty in 1968 and 1969 because the underpayment of tax required to have been shown on his and Verna's 1968 and 1969 returns was due in part or in whole to petitioner's fraudulent intent to avoid tax. We conclude that petitioner meets the requirements of section 6013(e). Therefore we do not need to, and do not reach the issue of fraud. Respondent has conceded that the amounts omitted from petitioner's and Verna's joint income tax returns for 1968 and 1969 exceeded 25 percent of the gross income stated in the returns.[8] Section 6013(e)(1)(A). Petitioner has the burden of proving that he meets the other two conditions set forth in section 6013(e), namely, that he did not know, and had no reason to know of, the omissions of income, and that he did not significantly *315 benefit from the omitted income and it would be inequitable to hold him liable for the tax deficiency on such omitted income. Raymond H. Adams,60 T.C. 300, 304 (1973). 1. Section 6013(e)(1)(B).
Section 6013(e)(1)(B) requires petitioner to establish that he did not know or have reason to know of the omissions of gross income when he signed the returns. In other words, petitioner must prove (1) that he did not have actual knowledge of the omissions, and (2) that the omissions were not of such character as to cause a reasonably prudent person possessed of petitioner's experience and temperament to have known of the omissions. Sanders v. United States,509 F. 2d 162, 165-167 (5th Cir. 1975); Patricia E. Mysse,57 T.C. 680, 697-699 (1972). The above determinations are questions of fact. Sanders v. United States,supra;Patricia E. Mysse,supra. *316 Both petitioner and Verna testified at trial. On the issue of petitioner's actual knowledge of the omissions, their testimony was in direct conflict. Petitioner testified that he did not know of the schemes between Verna and Burrows in connection with WCO, nor of the income from such schemes, when he signed the 1968 and 1969 returns. Verna, on the contrary, testified that she told petitioner of the Brothers Four transactions, and that with each new major purchase during the years at issue, she kept admonishing petitioner to curb his spending because they were spending money that was not theirs. Further, Verna testified that she told petitioner that Burrows was using the Eckles and Petty accounts to deposit funds from his sales of logs to WCO since he, as a WCO employee, was not supposed to sell timber directly to WCO. Where statements by conflicting witnesses on a key element in a case are in direct conflict, it is the trier of fact who must resolve the inconsistency. The Brothers Four, Petty and Eckles schemes were all embarked upon by Verna at the request of her superior at WCO, Robert Burrows. When asked whether she thought what she was doing was wrong, Verna stated that she *317 just didn't "think about it" and that she merely "followed instructions" from Burrows. Petitioner was never contacted by WCO or any investigating officer concerning repayment of the funds, and Verna alone signed the note and mortgage to WCO in 1970 to repay the funds. Verna has not contested this tax deficiency against her, and if petitioner is not held liable and not required to pay some or all of the tax, Verna will have to pay it. After a careful review of testimony given by both petitioner and Verna, and considering their demeanor and manner of testifying and the substance of their testimony, we believe petitioner rather than Verna. Next we consider whether petitioner had "reason to know" of the omissions of gross income from the 1968 and 1969 returns. This Court in prior decisions on this point has considered among other factors the following: (1) whether the alleged innocent spouse participated in the family's business affairs or was involved in the business' bookkeeping or accounting functions, [9] (2) whether the spouse who had omitted income from the return failed to be forthright with the alleged innocent spouse about the couple's income, [10] and (3) whether during the years *318 at issue there were unusual or lavish expenditures that should have put the alleged innocent spouse on notice of the omissions. [11]
Petitioner throughout his adult life has worked as a logging truck driver. His formal education ended when he completed the eighth grade. In 1964 he married Verna and in 1965 they started a log hauling business. Because of petitioner's unfamiliarity with bookkeeping, with Federal income tax returns and generally with business financial transactions, Verna assumed the responsibility for handling all financial transactions in both their personal and business lives. While petitioner had his responsibilities in connection with the business, [12] he relinquished financial control to Verna. Verna billed the loggers, deposited payments in the bank, maintained the business checkbook, paid all expenses, handled the business payroll, *319 filed tax reports with the state, and compiled data to be submitted to the accountant who prepared their Federal income tax returns. Petitioner had no reason to assume that his wife would not keep an accurate accounting of their finances. Further, because of his unfamiliarity with the business financial transactions, he never questioned her entries. As such, he had no "reason to know" of income omissions based on his familiarity with the financial side of their business. Compare Howard B. Quinn,62 T.C. 223, 230-231 (1974), affd. 524 F.2d 617 (7th Cir. 1975); Jerome J. Sonnenborn,57 T.C. 373, 381-384 (1971). Since petitioner did not know of his wife's income from the transactions she entered into with Burrows, he did not question her concerning this income and there was no occasion for her to be evasive or uncooperative. Compare Raymond H. Adams,60 T.C. 300, 303 (1973). Next we consider whether there *320 were unusual or lavish expenditures which should have given petitioner "reason to know" that funds for such expenditures were originating from unreported income. In Patricia E. Mysse,57 T.C. 680, 697-699 (1972), we concluded that because of the taxpayer's limited knowledge of the family's financial situation and because all the expenditures were in the nature of ordinary support, the excess of the amount spent over current income did not give that taxpayer reason to know of omitted income. Unlike the expenditures in Patricia E. Mysse,supra, those herein during the years at issue probably did not exceed current available spendable income.[13] We stated in Mysse,supra, however, that had there been lavish expenditures, regardless of the relation of available income to expenditures, we might have more readily inferred that the taxpayer had "reason to know" of an unreported source of income. "To be entitled to the benefits of section 6013(e) the spouse is not required to have perfect knowledge of the family's finances * * * however, she cannot close her eyes to unusual or lavish expenditures." 57 T.C. at 699. *321 Respondent contends that the acceleration of petitioner's and Verna's expenditures during the years at issue over earlier years, the increase in the number of trucks and trailers owned in the later years, and generally each and every other item purchased during 1968 and 1969, qualified as unusual or extraordinary expenditures sufficient to put the petitioner on notice that sources of unreported income must be present. We do not agree. When petitioner married Verna all he owned was a Dodge pickup truck and his clothes, and Verna owned a restaurant. It is apparent, however, that from 1965 through 1969 their proprietorship proved to be a successful business. In 1968 the business had gross sales of $124,247 and a gross profit of $99,136, while in 1969 it had gross sales of $158,985 and a gross profit of $118,314. During the years at issue this resulted in a good cash flow. While petitioner did not keep financial records nor compile the Federal income tax returns, it is not unreasonable to assume that he was able to recognize a continuing improvement in his own standard of living from a successful business venture with his wife. The increase in the number of trucks and trailers purchased *322 during the years at issue is consistent with the increasing success of the business as it developed over time. There was no need for petitioner to infer there was a source of funds beyond the income of the business. The equipment was purchased with modest downpayments, frequently only an old truck, and modest installment payments, primarily interest. The purchase of the truck shop was also justified by the increasing resources of the business. None of the other expenditures during the years at issue stands out as unusual or lavish in view of petitioner's and Verna's standard of living. The motorcycle, the transportation for petitioner's children to occasionally visit him from northern California, and petitioner and Verna's Reno vacation were not beyond their apparent reach. Their new home was purchased with the downpayment of the couple's old home, the balance to be paid in installments. This is hardly lavish or extraordinary. What was beyond their reach financially was paying off the mortgage. Petitioner was not aware during the years at issue of these extraordinary payments by Verna on the mortgage. We do not consider the new furniture purchase for the new home to be extraordinary *323 or lavish. We conclude that the facts simply do not support respondent's claim of unusual or lavish expenditures which should have given petitioner reason to know of the existence of an unreported source of funds. Petitioner has carried his burden of proof under section 6013(e)(1)(B). 2. Section 6013(e)(1)(C).
Section 6013(e)(1)(C), the third condition to relief as an innocent spouse, requires a determination of whether it would be inequitable to hold petitioner liable. In making that determination, we are to consider whether petitioner benefited directly or indirectly to a significant extent from the items omitted from gross income. However, even if there has been significant benefit, we can still, based on all other facts and circumstances, [14] conclude that it would be inequitable to hold petitioner liable for deficiencies attributable to the omissions. S. Rept. No. 91-1537 (1970), 1971-1 C.B. 606, 608; see also Dakil v. United States,496 F. 2d 431, 433 (10th Cir. 1974). The application of section 6013(e)(1)(C) requires a determination that is subjective and essentially factual. Jennie Allen,61 T.C. 125, 130 (1973), *324 rev'd on other grounds, 514 F. 2d 908 (5th Cir. 1975). Normal support does not constitute significant benefit. Section 1.6013-5(b), Income Tax Regs. Evidence of direct or indirect benefit may consist, however, of unusual support or transfers of property, including transfers which may have been received several years after the year in which the omissions took place. Section 1.6013-5(b), Income Tax Regs.; S. Rept. No. 91-1537, supra. Property settlements may provide insight into whether the spouse seeking relief benefited from the omitted income. Jennie Allen,supra;Raymond H. Adams,60 T.C. 300, 303-304 (1973). In our findings of fact we noted that certain portions of the unreported income could be traced to specific expenditures during the years at issue. Verna made a $5,500 gift to her boyfriend, Robert Bailey. Verna also paid off the balance on the home mortgage once she realized petitioner was leaving her. Those mortgage payments *325 by Verna were in apparent anticipation of receipt of the home in the future property settlement. Petitioner was unaware of those extraordinary mortgage payments, as he was unaware that Verna had bought a lot adjacent to the home. Those payments were not of benefit to petitioner. The furniture for the new home was purchased shortly after the home was completed in May or June of 1969. Petitioner visited the home on weekends from his job location in Morton for only a few months before the new home and furniture were transferred to Verna in the property settlement agreement. That limited use of the furniture was hardly a significant benefit to petitioner. Respondent also suggests that petitioner used the home and furniture as a negotiating device in deriving the terms for the property settlement, and that since they were used as a negotiating medium, petitioner indirectly benefited from it. But petitioner testified, and we have found, that the property settlement agreement resulted more from Verna's demands than from bargaining. Furthermore, had petitioner known of the actual equity in the new home, it is hard to believe he would have allowed Verna to receive it together with other *326 assets having an equity two times greater than those assets he received. We believe the property settlement makes it clear that petitioner did not substantially benefit from Verna's appropriated moneys. After running a successful log hauling business for about five years, petitioner ended up with assets worth $18,205 and Verna ended up with assets worth $55,535. It was Verna (until her defalcations were detected) who profited from her misdeeds, not petitioner. Under these circumstances, we conclude that it would be inequitable to hold petitioner liable for the deficiencies attributable to the omitted income. Petitioner is entitled to the relief provided in section 6013(e). Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue. ↩
2. Petitioner does not dispute his liability for the 1967 deficiency.↩
3. The record does not reflect the amount Verna received from her restaurant business.↩
4. Both petitioner and Verna were authorized to write checks on the Mac Hackney account, but petitioner wrote only a few for truck parts and some expense money.↩
5. Sometimes, at Verna's direction, WCO's office girls would actually deposit the checks.↩
6. Petitioner moved to Morton, Washington for a hauling job in May or June of 1969, and returned home only on weekends.↩
6a. These amounts represent the adjusted gross income from the 1968 and 1969 joint returns plus non-cash depreciation and non-cash losses.↩
7. Section 6013(e) provides: (1) In General. -- Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. (2) Special rules. -- For purposes of paragraph (1)-- (A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws, and (B) the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A).↩
8. Section 6013(e)(2)(A) provides: (A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws,↩ * * * [Emphasis added.]
9. See Howard B. Quinn,62 T.C. 223, 230-231 (1974), affd. 524 F.2d 617 (7th Cir. 1975); Jerome J. Sonnenborn,57 T.C. 373, 381-382↩ (1971). 10. Raymond H. Adams,60 T.C. 300, 303↩ (1973). 11. Patricia E. Mysse,57 T.C. 680, 697-699↩ (1972).
12. Petitioner purchased trucks, secured hauling jobs, scheduled drivers, drove trucks himself, handled truck maintenance, and picked up trip tickets and scale receipts and took them to the business office.↩
13. In Patricia E. Mysse,supra,↩ we relied upon gross income as the appropriate measure from which to offset expenditures. On our facts, since the primary source of income was the business, and since there was a series of "paper reductions" in funds available to spend, a more appropriate figure to use is the cash flow.
14. The fact that the person seeking relief has been divorced from the spouse responsible for the omissions is a relevant factor that should be considered. Section 1.6013-5(b), Income Tax Regs.↩