SUWAN NGUANTRI RATANA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; REBECCA C. RATANA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ratana v. Commissioner
Docket Nos. 9581-76; 1560-77; 1135-77.
United States Tax Court
T.C. Memo 1980-353; 1980 Tax Ct. Memo LEXIS 236; 40 T.C.M. (CCH) 1119; T.C.M. (RIA) 80353; September 2, 1980, Filed *236 Petitioners Mr. and Mrs. Ratana were born in Thailand and the Philippines, respectively. Both were resident aliens in the United States. During some of the years in issue Mr. Ratana worked at the Royal Thai Embassy. Mrs. Ratana worked as a nurse. In 1975 Mr. Ratana terminated his employment with the Embassy. Prior to and after leaving the Embassy Mr. Ratana earned income from the sale of narcotics. Neither the Embassy nor narcotics income was reported by petitioners on their joint returns for 1974 and 1975. Mr. Ratana and the Embassy advised Mrs. Ratana erroneously that his Thai salary was tax exempt. Petitioners were audited twice by respondent and his agents accepted this view. Held: All of Mr. Ratana's income was subject to tax under sec. 61, I.R.C. 1954. Held further: Mrs. Ratana qualifies as an innocent spouse under sec. 6013(e). Suwan Nguantri Ratana, pro se in docket Nos. 9581-76 and 1560-77. *237 Julie Noel Gilbert and Andrew D. Pike, for the petitioner in docket No. 1135-77. Charles B. Zuravin, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Under date of December 3, 1976 respondent issued a statutory notice of deficiency to petitioners asserting deficiencies in income tax *238 and additions to tax as follows: Sec. 6653(b)
Calendar Year
Deficiency
Addition to Tax
1974
$ 91,582.30
$ 45,791.15
1975
415,034.63
207,517.32
Rebecca C. Ratana filed a petition, in her name only, challenging said deficiency on February 7, 1977 and the petition was assigned docket number 1135-77. Suwan Nguantri ratana filed a petition, in his name only, challenging said deficiency on February 10, 1977 and that petitioner was assigned docket number 1560-77. On October 6, 1976 a jeopardy assessment, pursuant to section 6861, I.R.C. 1954, had been made with respect to the 1974-75 joint liability of petitioners. On June 8, 1976 respondent, pursuant to section 6851, made a termination assessment with respect to Mr. Ratana's income tax liability for the period January 1, 1976 to May 10, 1976. On August 3, 1976 a statutory notice of deficiency was issued to Mr. Ratana asserting a deficiency of $778,069.41 for that period. Mr. Ratana's petition challenging that assessment was assigned docket number 9581-76 and was filed October 21, 1976. These cases were called from the calendar for the trial session of the Court at Washington, *239 D.C., on April 16, 1979. At that trial no appearance was made by or on behalf of either petitioner. Respondent filed a motion for continuance and consolidation for the purposes of trial and briefs in docket Nos. 9581-76, 1135-77 and 1560-77. Respondent also filed a motion for partial summary judgment in docket No. 1560-77. After a hearing on respondent's motion for consolidation, held on May 30, 1979, the motion was granted. Further, the Court granted respondent's motion for partial summary judgment in docket No. 1560-77. The motion related to the addition to tax under section 6653(b) and only to Mr. Ratana. *240 On July 9, 1979 respondent filed a motion in docket Nos. 9581-76 and 1560-77 for an order to show cause why certain facts should not be stipulated. On July 18, 1979 the Court issued the requested show cause order and, upon failure of petitioner Suwan Nguantri Ratana to respond, made said order absolute on October 9, 1979. Therefore respondent's proposed stipulations of facts are accepted as established for the purposes of the cases at docket Nos. 9581-76 and 1560-77. FINDINGS OF FACT The foregoing metioned stipulations of facts accepted by the Court as established *241 in docket Nos. 9581-76 and 1560-77 are as follows: [1]
1. the petitioner, Suwan Nguantri Ratana, was born in Bangkok, Thailand on March 15, 1931. In 1962 he immigrated to the United States as a resident alien. The petitioner has never become a United States citizen. On December 8, 1961 as part of the process of immigrating to the United States, the petitioner executed a Waiver of Rights, Privileges, Exemptions and Immunities which estops him from claiming immunity as a foreign national for criminal violations and income tax liabilities. 2. The petitioner and his wife timely filed a joint 1974 personal income tax return. 3. The petitioner and his wife timely filed a joint 1975 personal income tax return. 4. In 1964, Suwan N. Ratana and his wife, Rebecca C. Ratana, purchased 1800 Franwall Drive, Silver Spring, Maryland in which they resided until March of 1967. The cost of the property was $18,212. Petitioner and his wife still own the property as tenants by the entirety. The property is now rented to third parties. The fair market *242 value of the property is approximately $60,000. 5. In 1967, the petitioner and his wife purchased what is now the petitioner's residence, 10502 Calumet Drive in Silver Spring, Maryland. The cost of the home was $27,993.50. The petitioner and his wife still own the property as tenants by the entirety. The fair market value of the property is approximately $80,000. 6. In 1970, petitioner and his wife purchased 8412 New Hampshire Avenue in Prine Georges County, Maryland. The cost of the property was $16,500. The property is now rented to third parties. The fair market value of the property is approximately $40,000. 7. In 1973, the petitioner and his wife purchased a tract of unimproved land of approximately two acres from Joseph and Rebecca Griffin. The cost of purchase was $26,000. This property is known as Bradfords West. The fair market value of the property is approximately $35,000. 8. In 1973, the petitioner and his wife purchased a tract of unimproved land of approximately 56,000 sq. ft. from William H. Campbell. The cost of the purchase was $6,500. This property is part of a subdivision known as Snowdens Manor Enlarged. The fair market value of the property *243 is approximately $15,000. 9. In the summer of 1976, the petitioner purchased condominium No. 301 located at 2306 Greenery Lane, Silver Spring, Maryland, for $27,500. The condominium is presently rented to third parties.The fair market value of the condominium is approximately $35,000. 14. From January 1, 1964 until April 30, 1975, petitioner was employed by the Royal Thai Embassy. Initially, he worked as a clerk, and as of October 1, 1968, as a bookkeeper. Mr. Ratana received the following amounts with respect to such employment: 1970 - $6,177.03; 1971 - $6,244.10; 1972 - $6,495.00; 1973 - $7,005.00; 1974 - $7,305.00; and 1975 - $2,330.00. 15. From early 1973 through the end of 1975, the petitioner was paid for services rendered as an outside sales representative for International Tour and Travel, a travel agency presently located at 1899 "L" Street, N.W., Washington, D.C.
16. A net worth and expenditures computation has been prepared by the respondent with respect to the joint taxable income of the petitioner and his wife for the 1974 and 1975 tax years. 17. As of December 31, 1973, December 31, 1974 and December 31, 1975, petitioner had deposited in his bank *244 accounts $3,457.81, $40,661.99 and $345,550.66, respectively. 18. The cost basis of real properties owned by the petitioner was $95,580.50 as of December 31, 1973, December 31, 1974 and December 31, 1975. 19. The petitioner is allowed a reserve for depreciation with respect to the rental properties owned by the petitioner and his wife. The depreciation reserve as of December 31, 1973, December 31, 1974 and December 31, 1975 are $6,332.72, $7,470.34 and $8,670.96, respectively. 20. As of December 31, 1973, petitioner and his wife jointly owned a 1970 Dodge Polara station wagon and a 1973 Volkswagon sedan. The sedan was titled only in Mr. Ratana's name [sic]. During 1974, petitioner and his wife sold the 1973 Volkswagon and purchased a 1965 Dodge sedan. The Dodge sedan was in turn sold in July of 1974 and petitioner and his wife jointly purchased a new 1974 Chevrolet Nova sedan. In 1975, petitioner and his wife jointly purchased a new 1975 Chevrolet Monte Carlo sedan. In September of 1975, the Ratanas sold the 1974 Chevrolet Nova sedan and purchased a used 1974 Volkswagon sedan titled in petitioner's name only. The cost of the various automobiles owned by the petitioner *245 and his wife as of December 31, 1973, December 31, 1974 and December 31, 1975 was $4,000.00, $5,147.32 and $11,261.30, respectively. 21. Petitioner and his wife had no cash on hand as of December 31, 1973, December 31, 1974 and December 31, 1975. 22. The petitioner owed $4,921.59 in personal loans as of December 31, 1973. There were no outstanding personal loans as of December 31, 1974 and December 31, 1975. 23. Petitioner's mortgage loans of of December 31, 1973, December 31, 1974 and December 31, 1975 were $51,852.25, $49,808.94 and $47,926.34, respectively. 24. Petitioner and his wife enjoyed increases in their net worth during 1974 and 1975 of at least $44,178.78 and $311,747.63, respectively. 25. Petitioner had medical expenditures as of December 31, 1974 and December 31, 1975 of $3,450.12 and $2,044.59, respectively. 26. Expenditures made by the Ratanas in clothing, variety and department stores and charge accounts for 1974 and 1975 were at least $23,833.65 and $10,389.30, respectively. 27. Expenditures made by the Ratanas at food stores and drug stores in 1974 and 1975 were at least $1,579.21 and $526.54, respectively. 28. Expenditures made by *246 the Ratanas for home improvement and repairs during 1974 and 1975 were at least $7,998.70 and $3,999.57, respectively. 29. Miscellaneous expenditures by the Ratanas for 1974 and 1975 were at least $3,546.52 and $7,684.97, respectively. 30. Expenditures made by the Ratanas for utilities during 1974 and 1975 were at least $1,295.44 and $1,322.16, respectively. 31. In 1975, the petitioner transferred $20,000 to his wife in order for her to purchase certificates of deposit. The certificates were in fact purchased by Rebecca C. Ratana in trust for the four children. 32. a. In 1974 and 1975, the petitioner paid interest to the Bank of Damascus in the amount of $1,093.97 and $892.09, respectively. b. In 1974 and 1975, the petitioner paid to the County Trust Company the amounts of $1,127.22 and $1,014.51, respectively. c. In 1974 and 1975, the petitioner paid to the National Permanent Savings and Loan Association the amounts of $2,449.50 and $2,005.37, respectively. d. In 1974 and 1975 the petitioner paid interest to the Perpetual Savings and Loan Association in the amounts of $834.88 and $677.43. e. In 1974 the petitioner paid a charge of of $3.50 to the National *247 Savings and Trust Company. f. In 1974 and 1975 the petitioner paid to the American Security and Trust Company the amounts of $9,352.10 and $1,005.70, respectively. g. In 1974 and 1975 the petitioner paid to the Suburban Trust Co. the amounts $7.36 and $1,010.70, respectively. h. Petitioner obtained cashier checks in 1974 and 1975 in the amounts of $35,770 and $155,000, respectively. i. In 1974 and 1975, the petitioner wrote checks to the Thai Military Bank in the amounts of $20,000 and $500.00, respectively. j. In 1974 the petitioner paid $1,156.94 to the First National City Bank. k. In 1975 the petitioner wrote checks to Mr. Somsanuk totalling $59,925.00. 1. In 1974 and 1975, the petitioner utilized "money transfer documents" to send money to various individuals and institutions out of the country in the amounts of $7,017.85 and $3,890.30, respectively. 33. Income taxes paid by the Ratanas to federal and state authorities for 1974 and 1975 totalled $1,327.90 and $1,237.97, respectively. 34. Petitioner suffered a loss of $647,32 in 1975 which resulted from the sale of the 1974 Chevrolet Nova sedan. 35. Petitioner paid $1,113.75 and $1,159.00 to *248 local governments in 1974 and 1975, respectively. 36. Payments made for travel and vacations by the Ratanas in 1974 and 1975 equal $15,579.29 and $18,264.62, respectively. 37. Expenditures in 1974 and 1975 by the petitioner and his wife for magazines, newspapers, periodicals, etc. were $85.08 and $147.90, respectively. 38. Expenditures made by the Ratanas to discount stores for 1974 and 1975 equal $52.59 and $44.44, respectively. 39. Payments made by the Ratanas to various individuals in 1974 and 1975 were $14,608.36 and $13,464.64, respectively. 40. Identified expenditures made by the Ratanas specifically for household items during 1974 and 1975 were $61.18 and $44.82, respectively. 41. Expenditures made by the Ratanas in 1974 and 1975 as educational expenses were $117.89 and $492.59, respectively. 42. Expenditures were made by the Ratanas in 1974 and 1975 from their various checking accounts made to indeterminate payees (illegible check copies) and/or indeterminate purposes in 1974 and 1975 in the amount of $3,070.45 and $6,391.47, respectively. 43. Checks made payable to either cash and/or the petitioner or his wife drawn on their various accounts *249 in 1974 and 1975 were $11,187.20 and $2,855.00, respectively. 44. One expenditure made by the petitioner in 1974 to an individual in Thailand was in the amount of $11,800.00. 45. In addition to all other expenditures, in 1975, the Ratanas spent $18,000.00 which was withdrawn from savings accounts and never redeposited in any other account. 46. Specifically, among the above set out receipts and expenditures were: a. Payments made to Lloyd Yingling in 1975 in the amounts of $60.00 and $38.00, respectively. b. Payments made to Dr. McMahon in 1974 and 1975 in the amounts of $60.00 and $38.00, respectively. c. Payments made in 1975 by the Ratanas to Dr. Alpher in the amount of $300.00. d. Payments made by the Ratanas in 1974 and 1975 to Dr. Stoehr in the amounts of $20.00 and $25.00, respectively. e. Payments made by the Ratanas to Pediatric Associates in 1974 and 1975 in the amounts of $26.00 and $5.50, respectively. f. Payments made by the Ratanas in 1975 to Dr. Bradley in the amount of $75.00.
g. Refunds made by International Tour and Travel paid to the petitioner in 1974 and 1975 in the amounts of $5,060.00 and $325.00, respectively. h. Refunds *250 paid to the petitioner by the owner of International Tour and Travel, Surinder Wadhwa in 1974 and 1975 in the amounts of $8.25 and $1,115.70, respectively. i. A check written by Riggs National Bank to the petitioner in 1974 in the amount of $11,800.00.
j. Money paid by the State Farm Insurance Company in 1974 to the Ratanas in the amount of $476.81. k. Payments made to the Washington Gas Light in 1975 in the amount of $99.32. l. Additional payments utilized to pay for automobiles by the Ratanas in 1974 and 1975 in the amounts of $2,100.00 and $50.00, respectively. 47. A nontaxable portion of a capital gain was enjoyed by the petitioner in 1974 in the amount of $100.00. 48. The petitioner was entitled to rental deductions in 1974 and 1975 in the amounts of $2,991.40 and $3,720.28, respectively. 49. The petitioner was entitled to a sick pay exclusion in 1974 in the amount of $675.00. 50. In 1974, the petitioner was entitled to a "loan payment write off" in the amount of $314.63. 51. The petitioner is entitled to the following itemized deductions: a. Charitable contributions made by the Ratanas in 1974 and 1975 were in the amounts of $208.00 and $211.00, *251 respectively. b. Miscellaneous itemized deductions to which the Ratanas are entitled for 1974 and 1975 are in the amounts of $400.00 and $475.00, respectively. c. Expenditures made by the Ratanas which constitute deductible interest in 1974 and 1975 are in the amounts of $2,370.72 and $1,670.45, respectively. d. Gasoline taxes allowed the petitioner by the respondent in 1974 and 1975 are in the amounts of $150.00 and $175.00, respectively. e. The Ratanas paid state and local income taxes in 1974 and 1975 in the amounts of $157.71 and $112.96, respectively. f. The Ratanas paid $457.80 as state sales taxes in both 1974 and 1975. g. The Ratanas paid real estate taxes in 1974 and 1975 in the amounts of $1,353.38 and $1,619.33, respectively. h. The Ratanas are entitled to $150.00 as an itemized deduction for medical expenses paid in 1974 and 1975. i. The Ratanas are allowed six personal exemption deductions in both 1974 and 1975. 52. Between January 1, 1976 and May 10, 1976, deposits were made in the following bank accounts and in the following amounts: a. Into the Suburban Trust Company checking account number XX-X529-5, there was deposited $785,797.83. *252 b. Into the University National Bank, checking account number X-XXX685-4, there was deposited $146.820.19. c. Into the Bank of Bethesda, checking account number X-XX-X5-482, there was deposited $31,280.00. d. Into the Citizens Bank & Trust Company, checking account number XXX3836, there was deposited $123,540.00. e. Into the American Security Bank and Trust Company checking account number XX-XXXX7163, there was deposited $11,150.00. f. Into the State National Bank checking account number XXX-079-4, there was deposited $11,600.00. g. Into the Chevy Chase Bank and Trust Company checking account number XXX-255-4, there was deposited $13,340.00. h. Into the First National Bank and Trust Company checking account number XXX-X124-8, there was deposited $58,175.00. i. Into the Union Trust Company of Maryland checking account number XXX-X3850 there was deposited $41,685.00. j. Into the First National Bank savings account XXX-X124-8-5-1 there was deposited $202.42. k. Into the American Security Bank savings account number XX-XXXX7163 there was deposited $868.48. 53. Interbank transfers between and among the various accounts belonging to the petitioner *253 from January 1, 1976 until May 10, 1976 totalled $28,194.97.
54. For the period January 1, 1976 until May 10, 1976, interest expenses attributable to the rental property at 8412 New Hampshire Avenue is $394.45. 55. For the period January 1, 1976 until May 10, 1976, depreciation allowed on 8412 New Hampshire Avenue, rental property, is $186.66 and the depreciation allowed on 1800 Franwall Avenue, rental property, is $192.54. 56. Checks written to Suwat Somsanuk are allowed as business expenses in the amount of $59,875.00. 57. The petitioner is entitled to five exemptions for purposes of calculating his taxable income for the terminated period ending on May 10, 1976. 58. Petitioner never received gifts of significant value from any scurce, or inherited money or property of significant value. Petitioner did not bring assets of significant value into this country when emigrating from abroad. 59. On August 11, 1976, the petitioner and his wife, Rebecca Ratana, were indicted on two counts of tax evasion, two counts of filing false returns, and one count of conspiring to file a false return. On October 20, 1976, the second day of the trial, the petitioner pled guilty *254 to two counts of violating the provisions of I.R.C.§ 7201, income tax evasion. As a result, the petitioner was sentenced to two four year terms to run consecutively. 60. The great majority of the unreported income underlying the statutory notices of deficiency involved in this case resulted from petitioner's importation into the United States and sale of various quantities of heroin and/or other narcotics during the years involved. The above facts have also been accepted, by stipulation, in the case involving Mrs. Ratana, i.e., docket No. 1135-77. Those facts as well as the additional stipulations of facts involving docket No. 1135-77 are so found. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference.
Mrs. Ratana was born in 1934 in Manila, Philippines. Her father was a Seventh Day Adventist minister and she was educated in the Philippines at religious schools maintained by the seventh Day Adventists. Mrs. Ratana began training as a nurse in Thailand and came to the United States in 1959 to continue her training. She has been employed as a registered nurse at Washington Adventist Hospital since *255 1959. Throughout per employment Mrs. Ratana had the hospital deposit a portion of her wages directly into a savings account at the Columbia Credit Union. In 1961 Mrs. Ratana married Suwan Ratana, a citizen of Thailand. Mr. and Mrs. Ratana purchased their first house in 1964. Mrs. Ratana supplied the down payment, $2,612, from her credit union account. In 1967 they purchased another house and again the down payment, $1,993.50, was provided from the credit union account of Mrs. Ratana. In 1970 they purchased a rental house in Prince George's County, Maryland. The down payment of $2,000 was paid entirely from Mrs. Ratana's savings. Mrs. Ratana's purpose in saving a portion of her own salary, and in using these savings to buy small property, was to accumulate sufficient assets to be able to send her children to religious secondary schools and colleges. From the date of their marriage until 1974 or 1975, Mr. Ratana took care of all family financial matters and prepared all income tax returns. From 1964 through April 1975, Mr. Ratana was employed by the Royal Thai Embassy. In every tax return he prepared throughout the period of his embassy employment, Mr. Ratana omitted from *256 gross income the amount of his embassy salary. This omission was based upon Mr. Ratana's belief that amounts paid by the embassy were excluded from gross income under sec. 893, I.R.C. 1954. Mrs. Ratana knew that Mr. Ratana did not report his embassy income on their tax return. She questioned him about this, and he advised her that his salary was not subject to tax since it was money from Thailand. Mrs. Ratana Did not accept her husband's explanation, and she went to the embassy toraise the question there. The person at the embassy to whom she spoke confirmed what her husband told her, and she did not question her husband on this matter again. The Federal income tax returns filed by the Ratanas for calendar years 1970 to 1973 were audited by the respondent in 1972 and 1974 respectively. The Ratanas were questioned during these audits about the omission of Mr. Ratana's embassy salary.After each audit there were minor adjustments. However, the omission of Mr. Ratana's embassy salary was accepted by the Internal Revenue Service. During 1974 and 1975 Mr. Ratana did a substantial amount of overseas traveling. Mr. Ratana's departures were often sudden and *257 unannounced. As a result, Mrs. Ratana and the children were frequently unaware of where he was or when he would return. Mr. Ratana told his wife that he had started an import business in Thailand. He also told her that he was fearful that Thailand might be taken over by the Communists. Because of this fear he believed it important that he complete the sale of his Thiland property. Mrs. Ratana believed that Mr. Ratana had income from his alleged import business and sale of his property. She also had discovered that Mr. Ratana was gambling heavily. At her urging he joined Gamblers Anonymous and she joined Gam-Anon, the support organization for spouses of compulsive gamblers. Mrs. Ratana asked her husband to give her some of the money he was making so she could put it in an account for the children. Thereafter, during 1975 and 1976, Mr. Ratana gave his wife $30,000 on the understanding that it was for the benefit of their four children. She was told by her husband that these funds represented proceeds from the sale of properties in Thailand. In 1975 Mrs. Ratana purchased, in trust for the benefit of her four children, two $10,000 certificates of deposit. In April 1976 she *258 purchased another $10,000 certificate of deposit for the benefit of the children.Any other funds received by Mrs. Ratana from her husband were used for the living expenses of the family. During 1974 and 1975 Mrs. Ratana made expenditures (in addition to the certificates of deposit for the children) in the following amounts and for the following purposes: 1974
195
Education
$1,670.74
$2,180.46
Music Lessons and Supplies
515.35
210.25
Reading Materials
68.22
176.72
Medical
Checks
854.50
218.07
Withholding
386.12
433.02
Food (Checks)
509.34
472.50
Bank of Damascus
1,455.48
1,334.19
Perpetual Building
1,152.00
1,056.00
County Trust Co.
1,513.09
1,506.10
National Permanent Federal
2,638.16
2,575.71
Clothing and Department
Store Charges
968.34
2,415.65
Other Household Items
99.29
0
Utilities
990.94
1,115.21
Photos
38.66
91.94
Insurance
304.15
172.00
Home Improvements
7,899.27
4,792.28
Gifts to Rebecca's
Parents
151.11
310.00
Transfers to Suwan Ratana
544.996
214.75
Real Estate Taxes
1,631.20
0
Cash
842.70
900.00
Miscellaneous
1,508.26
853.42
TOTAL
$25,741.91
$21,028.27
In addition to the above *259 expenditures for food, paid by check, Mrs. Ratana also spent approximately $3,800 and $4,000 for food during 1974 and 1975, respectively. Total funds available to Mrs. Ratana from sources other than Mr. Ratana's salary were $22,270.65 and $13,569.23 for 1974 and 1975, respectively. Mr. Ratana also made expenditures for the benefit of the family. However, he did not make any gifts to Rebecca and she has never made any lavish or expensive purchases for herself. All of the funds, which Mrs. Ratana received from her husband, were used either for the support of the family or to purchase certificates of deposit for the children. OPINION Respondent's motion for partial summary judgment, with respect to the fraud issue in docket No. 1560-77, was granted on May 30, 1979. The only issue remaining, with respect to Mr. Ratana, in both docket Nos. 1560-77 and 9581-76, is the amount of taxable income received by him during 1974, 1975 and 1976 under section 61, I.R.C. 1954. Section 61 includes in gross income "all income from whatever source derived," unless otherwise provided.Mr. Ratana has not contested the amount of gross income determined by respondent. Petitioner's *260 only contention is that his income from the Royal Thai Embassy is excludable from gross income under section 893. Broadly stated section 893(a) excludes from gross income compensation of any employee of a foreign government if the employee is not a citizen of the United States and the foreign country in question grants an equivalent exemption to employees of the United States performing similar services in such foreign country. Section 893(b) requires the Secretary of State to certify to the Secretary of Treasury the names of those countries which granted the required equivalent exemption. On March 1, 1965 the United States and Thailand entered into an income tax convention that would have granted such an exemption. However, during the years in issue, the agreement had not been ratified and therefore was not in effect. Accordingly, we find that Mr. Ratana's salary from the Royal Thai Embassy was required to be included in gross income in 1974 and 1975. The other major source of income for Mr. Ratana was from the importation and sale of narcotics. Even though this income may have been earned from illegal activity it must be included in gross income and is subject to tax. *261 James v. United States,366 U.S. 213 (1961). Accordingly, we sustain respondent's determinations with respect to Mr. Ratana (i.e., docket Nos. 9581-76 and 1560-77). With respect to Mrs. Ratana the first issue is whether any of the underpayment of tax in 1974 and 1975 was due to fraud within the meaning of section 6653(b). Fraud is an actual intentional wrongdoing, the intent required is the specific purpose to evade a tax believed to be owing. McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. den. 424 U.S. 967 (1976). In order to establish that an underpayment is due to fraud, respondent must prove, by clear and convincing evidence, that petitioner had the specific purpose and intent to evade a tax believed to be owing and the underpayment of tax must be due to, or caused by, the purpose and intent to evade tax. Section 7454(a); Rule 142, Tax Court Rules of Practice and Procedure. The existence of fraudulent underpayment can be established by circumstantial evidence and reasonable inferences drawn from the entire record. Stoltzfus v. United States,398 F.2d 1002, 1005 (3d Cir. 1968). *262 However, the mere suspicion of fraud is insufficient and it will not be imputed or presumed. Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959). To apply the section 6653(b) addition to tax to both spouses, in the case of a joint return, respondent must prove that some part of the underpayment is due to the fraud of both spouses. Section 6653(b). After a thorough review of the entire record we find that respondent has failed to establish that any portion of the underpayment was due to intent to defraud the Government on the part of Mrs. Ratana. Respondent does not contend that the omission of Mr. Ratana's salary from the Royal Thai Embassy was due to an intent to evade taxes. Instead he argues that Mrs. Ratana was aware of her husband's overseas business, and by knowingly omitting that income, she is liable for the section 6653(b) addition to tax. First, we note that the business to which Mrs. Ratana was "aware" did not even exist. Mr. Ratana had informed his wife that he went to Thailand to sell property he owned there and to open an import business. In fact Mr. Ratana's income came from the sale of narcotics, an activity of which Mrs. Ratana was totally *263 unaware. Respondent has not established with any clarity that Mrs. Ratana was aware of her husband omitting any taxable income from their return. The record is clear that Mrs. Ratana did not believe that any taxable income had been omitted from the return. Even more clear is the fact that Mrs. Ratana did not intentionally omit income with intent to defraud the Government. Therefore, we find that petitioner Mrs. Ratana is not liable for the section 6653(b) addition to tax. The final, and only difficult, issue for decision is whether Mrs. Ratana is an innocent spouse entitled to relief from liability for tax and penalty as provided by section 6013(e).Under that section a spouse is considered to be innocent of wrongly omitting income, even though she joined in the filing of a return under section 6013(a), if three prerequisites are met: (1) there is omitted from gross income an amount properly includable, the omission is attributable to the other spouse and exceeds 25 percent of the gross income stated in the return; (2) the spouse did not know, and had no reason to know, of such omission; and (3) after considering all facts and circumstances and whether the spouse derived substantial *264 benefit from the omitted income, it is inequitable to hold the spouse liable for the deficiency resulting from the omission. [2] Mrs. Ratana has the burden of proving that she satisfied each of the requirements set forth in the statute. Adams v. Commissioner,60 T.C. 300, 303 (1973). *265 The parties have stipulated that the first condition has been met. After considering the testimony and other evidence, we conclude that Mrs. Ratana has satisfied the second and third conditions. The record clearly establishes that Mrs. Ratana lacked actual knowledge that amounts properly includable in gross income were omitted. This fact was corroborated by her testimony and she impressed us as a credible witness. Accordingly, we find that she did not have actual knowledge within the meaning of section 6013(e)(1)(B). The next question presented is whether Mrs. Ratana has established that she had no reason to know that properly includable income was omitted from the returns. The test applied is whether a reasonable taxpayer in similar circumstances would not be expected to have knowledge of the omission. Sanders v. United States,509 F.2d 162, 166-167 (5th Cir. 1975). Further, mere ignorance of the law is not enough. As we said in McCoy v. Commissioner,57 T.C. 732, 734 (1972), "[We] do not think section 6013(e) was designed to abate joint and several liability where the lack of knowledge of the omitted income is predicated on mere ignorance *266 of the legal tax consequences of transactions the facts of which are either in the possession of the spouse seeking relief or reasonably within his reach." With respect to the embassy income of Mr. Ratana, the record clearly establishes that Mrs. Ratana acted reasonably. First she inquired of her husband with respect to the taxability of his income. She did not accept his explanation and pursued the matter by making inquiry at the Royal Thai Embassy. An Embassy official confirmed her husband's statement that the income was nontaxable. Further, respondent twice audited petitioners and made no adjustment with respect to Mr. Ratana's income, even though he was aware of Mr. Ratana's employment. In the context of this issue we see no reason to hold Mrs. Ratana more accountable for her lack of knowledge of tax law than agents of the respondent. Mrs. Ratana was generally lacking in financial knowledge. Further, her religious and cultural background instilled in her a belief that she was to abide by her husband's wishes. Under these circumstances we believe that Mrs. Ratana acted in the most prudent manner possible. With respect to the income from narcotics sales, respondent *267 contends that, even though Mrs. Ratana was unaware of the activity, she should have known that her husband was earning taxable income overseas. Respondent's position is premised upon the idea that, since Mr. Ratana made expenditures which Mrs. Ratana was obviously aware of, she should have known that those expenditures were made with taxable income which had been omitted from their income tax returns. We believe the record clearly shows that Mrs. Ratana believed the funds that she received from her husband were from the sale of his property in Thailand. Further, the expenditures made by Mr. and Mrs. Ratana were for the ordinary support of the family. Such expenditures are not of a type which would apprise Mrs. Ratana of the omission of properly includable income. Section 1.6013-5(b), Income Tax Regs. and Mysse v. Commissioner,57 T.C. 680, 698 (1972). That expenditures by Mrs. Ratana were not substantially greater than the amount she had available without assistance from Mr. Ratana further convinces us that she could not reasonably have been expected to realize the omission. Respondent contends that Mrs. Ratana's receipt of $20,000 *268 in 1975 and $10,000 in 1976 should have apprised her of the omissons. Under normal circumstances, receipt of a large lump-sum amount of cash should cause the taxpayer to make inquiry. Unfortunately we do not here deal with normal circumstances. We look to determine if Mrs. Ratana acted as a reasonably prudent person, with her knowledge and background, would have acted. We believe that Mrs. Ratana has satisfied the test set out in Sanders and McCoy. Mrs. Ratana, as we stated before, believed the proceeds resulted from the sale of property in Thailand. The facts "reasonably within her reach" would not have indicated to the contrary. In light of her limited financial knowledge and background Mrs. Ratana acted as prudently as possible. After a thorough review of the entire record, and on the facts of this case, we find that Mrs. Ratana did not have reason to know of the omission of prperly includable income in their 1975 and 1976 tax returns. Finally we must determine whether, after considering all the facts and circumstances and whether Mrs. Ratana derived substantial benefit from the omitted income, it is inequitable to hold her liable for the deficiency which resulted *269 from the omission. We have already found that all the funds received by Mrs. Ratana from her husband were utilized for the ordinary support of the family, with the exception of the proceeds used to purchase certificates of deposit. Funds used for the ordinary support of the family do not constitute substantial benefit. Section 1.6013-5(b), Income Tax Regs.; Mysse v. Commissioner,supra at 698. Further, we find that the proceeds used to purchase the certificates of deposit do not represent substantial benefit to Mrs. Ratana. Mr. Ratana transferred these proceeds to his wife with the understanding that they would be used for the benefit of the children. The certificates of deposit were held by Mrs. Ratana as trustee with the children listed as the beneficiaries thereof. We do not believe that the mere creation of Mrs. Ratana's legal right to these funds, without more, confers substantial benefit within the meaning of section 6013(e)(1)(C). Put in the perspective of the amount here involved, it is even clearer that any benefit resulting to Mrs. Ratana was not substantial. Respondent has determined, and we have found, that Mr. *270 Ratana underreported approximately $169,000 and $633,000 in 1974 and 1975, respectively. The record shows that Mr. Ratana was a compulsive gambler and often left the country without notifying his family. On the other hand, Mrs. Ratana was a hard working, religious and dutiful parent. Her primary concern was her family. To earn extra money she often worked overtime and rarely took a vacation. To hold Mrs. Ratana liable under these facts for a deficiency that primarily resulted from her husband's illegal sale of narcotics, an activity of which she had no knowledge, would clearly be inequitable. Accordingly, we find that Mrs. Ratana satisfies the requirements of section 6013(e)(1)(C). Decisions will be entered for respondent in docket Nos. 9581-76 and 1560-77.
Decision will be entered for petitioner in docket No. 1135-77. Footnotes
1. References to petitioner refer to Mr. Ratana only unless stated to the contrary. References to exhibits have been deleted.↩
2. Sec. 6013(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES-- (1) In General Under regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. (2) Special Rules--For purposes of paragraph(1)-- (A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws, and (B) the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A).↩